**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Abdul Rahman Mohammed DEEB and Ahmad Naim Bayaa, Defendants–Appellants.**

**Nos. 97–50157, 97–50286.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 4, 1998.

Submission Vacated Aug. 31, 1998.

Resubmitted May 10, 1999.

Decided May 24, 1999.

---

Jerry L. Newton, Hermosa Beach, California, for defendant-appellant Bayaa.

Joel Levine, Encino, California, for defendant-appellant Deeb.

Barbara M. Scheper, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: REINHARDT, TROTT, and T.G. NELSON, Circuit Judges.

T.G. NELSON, Circuit Judge:

Abdul Rahman Mohammed Deeb and Ahmad Naim Bayaa appeal their convictions for conspiracy to commit securities fraud, securities fraud, and money laundering, in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b–5, and 18 U.S.C. § 1956(a)(1)(A)(i). We have jurisdiction under 28 U.S.C. § 1291. We affirm the convictions.[1]

## BACKGROUND

Deeb and Bayaa are lifelong friends who grew up together in Lebanon and

---

**1.** In this opinion, we address only the money laundering convictions. Other issues raised by Deeb and Bayaa are addressed in an un-published memorandum disposition issued contemporaneously.

emigrated to the United States in the 1980s. In 1981, Bayaa founded Southland Communications, Inc. ("Southland"), which did business as National Paging and provided radio paging service to individuals and institutions. Although his title is not clear from the record, Deeb worked closely with Bayaa during the management of the business. In 1987, Southland went public and was thereafter traded on the NASDAQ market.

In 1988, Bayaa and Deeb met Shaw Tehrani, who was then a stockbroker at a firm in Atlanta, Georgia.[2] This is when the conspiracy began. In January 1989, at Deeb's and Bayaa's direction, Tehrani opened several margin accounts [3] in the names of individuals referred to him by Bayaa and Deeb. Apparently, Tehrani never communicated directly with these "clients," included false information regarding the accounts on the account opening documents, and signed these documents in the names of the "clients" whom he had never met. These accounts were used, with financing from Bayaa and Deeb, to purchase Southland stock.

In effect, Bayaa and Deeb controlled large amounts of Southland stock through these "nominee" accounts that were opened in the names of other individuals. From approximately June 1988 to May 1990, Deeb, who also controlled several bank accounts, acted as a conduit through which money was funneled to pay for stock purchased by Tehrani in these accounts. These transactions were often complex, involving a network of monetary transfers which ultimately ended with wire transfers of funds to Tehrani who then purchased Southland stock. The Government's theory at trial was that this elaborate purchasing network was designed to conceal the source of the funds used to pay for the stock accumulated in the various accounts.

In 1989, Tehrani moved to a different brokerage firm, taking with him the Southland accounts referred to him by Bayaa and Deeb. At the new firm, the network of purchasing continued until August 1989 when the firm informed Tehrani that it was no longer willing to carry margin accounts holding Southland stock because of the high concentration of Southland stock in those accounts. Tehrani therefore simply redistributed the accounts, without the permission of the "clients," to various other brokerage firms. By the beginning of 1990, however, all of these accounts had been transferred to the brokerage firm of Suplee Reed, who agreed not to loan out the margined portion of stock to short sellers.[4]

In March 1990, the conspirators became extremely concerned when they learned that an anonymous report had been circulated in the investment community recommending that Southland stock be sold short. To prevent Southland stock from plunging in value, Deeb, Bayaa, and Tehrani decided to purchase any Southland stock that came on the market in the name of the nominee accounts maintained by Suplee Reed (a strategy called "squeezing the shorts"). This created the appearance that there were loyal shareholders and

---

**2.** Tehrani pleaded guilty to conspiracy to commit securities fraud and was sentenced on December 9, 1996, to forty months' imprisonment. He is not a party to this appeal.

**3.** Margin accounts allow the buyer to purchase stock by typically paying only 50% of the stock's price with the brokerage firm loaning the client the remaining 50% and charging interest on the loan.

**4.** In a "short sale," an investor contacts his broker and borrows a particular stock from the broker and sells it on the open market. The investor receives the proceeds from the sale and then has a certain amount of time within which to return the borrowed stock to the broker. The investor expects to be able to repurchase the same stock for less than he sold it and keep the difference as his profit. Therefore, the short seller is betting that the stock price will go down in the short term.

In a "long buy," the investor will give the broker cash in exchange for the security with the hope that the stock will rise in price. Most long-term investors "buy long" rather than "sell short."

other investors interested in the stock and willing to fight to maintain a good price. However, what the outside investor did not know was that the majority of Southland purchases were being made by these fraudulent nominee accounts controlled by Bayaa and Tehrani using financing arranged by Bayaa and Deeb.

The conspirators were successful in purchasing over 100,000 shares of Southland through the use of margin accounts set up in Deeb's name not only at Suplee Reed but also at Blunt, Ellis & Loewi and Paine Webber. After making the purchases through these nominee accounts, Deeb was unable to come up with the money he needed to cover his margin requirements. Bayaa recruited Imad Twal to assist him in coming up with money to cover Deeb's accounts. Twal arranged for several investors to send money to Deeb in return for Deeb's assurance that the stock would then be issued in their names. Either Bayaa or Deeb told Twal that the transfer would take place within two weeks of receiving the money. After receiving thousands of dollars from these investors, Deeb and Bayaa failed to transfer any shares into the names of the investors.

During this buying frenzy, Tehrani recruited Eduardo Anton to help save Southland.[5] Together, they opened two other accounts at Suplee Reed and purchased over $1 million worth of Southland stock. This purchasing binge ultimately resulted in Bayaa, Deeb, Tehrani, and Anton controlling 88% of Southland's stock. By controlling the supply of Southland stock available on the open market, the four conspirators effectively dominated the short sellers, inflating the price of the stock from approximately $9 per share on March 2 to $17 per share on April 3, 1990. On April 4, the Securities and Exchange Commission, casting a suspicious eye on the unexplained rise in the stock's price,

ordered a ten-day halt on trading of Southland.

The suspension caused several brokerage firms, including Suplee Reed which was owed $7.6 million on its accounts, to issue margin calls for their clients to pay additional money into their accounts. The "clients," who were actually Deeb and Bayaa, did not have the money to cover these calls. On April 11, Tehrani met with Suplee Reed's clearinghouse in an attempt to prevent the firm from immediately dumping its accounts on the market. Tehrani claimed that Anton had a $10 million certificate of deposit drawn on a Swiss bank that could be pledged as collateral to secure the margin debt. Anton faxed a copy of the time deposit to the clearinghouse, who declined to accept it after consulting with its bankers. This turned out to be a wise move because the certificate was a complete forgery. When trading resumed, the stock's price plunged, ultimately forcing Suplee Reed into bankruptcy in 1994, due in large part to the losses taken on the Southland accounts.

On October 13, 1994, Bayaa and Deeb were indicted on charges of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b–5, and money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). On May 22, 1996, Bayaa and Deeb were convicted of conspiracy, money laundering, and several counts of securities fraud. On February 21, 1997, Deeb was sentenced to sixty-three months' imprisonment. On May 27, 1997, Bayaa was sentenced to eighty-seven months' imprisonment. Both defendants timely appeal.

## ANALYSIS

### A. *The Statute*

■ The district court's interpretation of the money laundering statute, 18 U.S.C.

---

**5.** Anton was tried at the same time as Bayaa and Deeb, but the jury was unable to reach any verdicts as to the charges against him.

On May 22, 1996, a mistrial was declared, and as of this date, Anton has not been retried.

§ 1956(a)(1)(A)(i), and the scope of the conduct covered by the statute is a question of law reviewed *de novo*. *United States v. Ripinsky*, 20 F.3d 359, 361 (9th Cir.1994), *amended by* 129 F.3d 518 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 870, 139 L.Ed.2d 767 (1998).

The money laundering statute makes it a crime for someone who, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts ... such a financial transaction which in fact involves the proceeds of *specified unlawful activity*-(A)(i) with the intent to promote the carrying on of *specified unlawful activity*." 18 U.S.C. § 1956(a)(1) (emphasis added). The phrase "specified unlawful activity" is defined, in relevant part, as "any act or activity constituting an offense listed in section 1961(1) of this title." 18 U.S.C. § 1956(c)(7)(A).

Section 1961(1) is the part of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO") that defines "racketeering activity." Among many other forms of criminal activity, "racketeering activity" is specifically defined to include "fraud in the sale of securities." 18 U.S.C. § 1961(1)(D). Deeb and Bayaa argue that because their conduct, if criminally fraudulent at all, only involved fraud in the *purchase* of securities, the money laundering statute does not cover their activities. We agree that the money laundering statute only covers sales of securities and not purchases. We do not agree, however, that the conspirators' conduct only involved the purchase of securities.

By clear and unambiguous language, the statute's coverage is limited to "fraud in the *sale* of securities." If Congress had intended.to include fraud in the *purchase* of securities in RICO's definition of "racketeering activity," it would only have needed to insert the words "or purchase" after "sale" as it did in 15 U.S.C. § 78j. It chose not to do so, and we will not punish the appellants in this case by torturing the explicit terms of the RICO statute to mean something more than the words can bear.[6]

The Government counters this argument by directing attention to the securities fraud statute and regulation, 15 U.S.C. § 78j and 17 C.F.R. § 240.10b–5, which explicitly cover fraud in "connection with the *purchase* or *sale*" of any security.[7] In *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776 (9th Cir.1996), we noted in a footnote that "[s]ecurities fraud violations under 10b–5 ... are predicate acts for RICO." *Id.* at 786 n. 7. The Government therefore argues, citing *Webster*, that "racketeering activity" must include both the purchase *and* sale of securities, despite the plain language of section 1961(1).

We are unconvinced. The Government has greatly inflated the importance of *Webster* to our decision in this case. *Webster* was a civil RICO case, involving allegations that one party had operated an inherently fraudulent pyramid scheme and illegally used the mails and wires in furthering the scheme. We reversed a grant of summary judgment for the defendant, holding that there was a triable issue of

---

**6.** Our interpretation is bolstered by the very next phrase in the definition of "racketeering activity," which includes "the felonious manufacture, importation, receiving, concealment, *buying, selling*, or *otherwise dealing* in a controlled substance." 18 U.S.C. § 1961(1)(D) (emphasis added). In describing narcotics activity, Congress had no difficulty detailing the specific conduct it intended to include in the definition of "racketeering activity," specifically including both buying and selling. There is no reason not to believe Congress could have done the same thing in

describing the scope of securities fraud it intended to include in the definition.

**7.** Title 15 U.S.C. § 78j makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance." Title 17 C.F.R. § 240.10b–5(c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

At top left of page: **1168**

fact as to whether this fraudulent scheme existed. If it did, we further held that such acts of fraud were "predicate racketeering acts sufficient to allow plaintiffs to invoke civil RICO." *Id.* at 786. In discussing the scope of the federal mail fraud statute, we noted in a passing footnote that 10b–5 violations are predicate acts for purposes of RICO, citing two civil cases. This statement, taken out of its context, hardly constitutes a holding by this court, let alone a holding of statutory interpretation that can be applied to future *criminal* prosecutions. It also does not even come close to answering the question in this case: whether the phrase "fraud in the sale of securities" contained in § 1961(1) includes fraud in the *purchase* of securities as well. In short, *Webster*'s relevance to this case is dubious at best.

We further reject the argument that "fraud in the *sale* of securities" is somehow broader than "fraud in the *selling* of securities." While it is certainly true that every "sale" also involves a "purchase," it is also true that every "selling" also involves a "buying." That alone is not sufficient to read the statute more broadly than its terms will allow. If Congress had intended to include both fraudulent buying and fraudulent selling of securities in its definition of "racketeering activity," it would have copied the clear language it used in 15 U.S.C. § 78j and 17 C.F.R. § 240.10b–5 where the terms employed clearly intend to cover both sides of the fraudulent securities transaction.[8]

### B. *The Conduct*

■ At oral argument, the Government argued that even if "sale" does not mean "purchase" for purposes of the money laundering counts, it had provided evidence at trial showing that Deeb and Bayaa engaged in fraudulent sales of securities. We ordered supplemental briefing to address this issue. There is sufficient evidence to support a conviction if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

In its brief, the Government advances two arguments: (1) that the proceeds from the sales of stock were used to advance the fraudulent scheme, and (2) that the pair made fraudulent offers to sell stock in order to cover the margin requirements of stock purchases made in March 1990. We reject the first argument but agree that the Government provided sufficient evidence for a rational trier of fact to conclude that Deeb and Bayaa engaged in fraudulent offers to sell securities.

Regarding the first argument, the Government does not contend that any of the sales of stock were illegal, only that the proceeds from the sales enabled the fraudulent scheme to continue. This does not amount to "fraud in the sale of securities" as required by 18 U.S.C. § 1961(1)(D) and does not support the money laundering convictions.

■ The second argument entails facts arising out of the defendants' efforts to purchase large amounts of Southland stock in 1990. In order to cover margin requirements that were incurred when Deeb and Bayaa purchased over 100,000 shares of Southland stock in March 1990, Bayaa approached Imad Twal, who testified at trial that he understood Deeb was selling stock on which he could not cover the margin requirements. Bayaa informed Twal that Deeb was willing to sell the stock at a price lower than it was currently trading. When Twal presented this opportunity to several investors, they viewed it as a no-lose proposition and sent money directly to Deeb based on the belief that the stock would then be issued in their names. In-

---

8. Besides, in those sections, Congress used the language "purchase or sale of any security" to describe the scope of coverage. If "sale" were intended to cover both buyers and sellers to a fraudulent transaction, the word "purchase" in those sections would be redundant. It is clear to us that the word "sale" contained in all of these statutes and regulations refers only to sellers, not buyers.

stead, Deeb deposited some of the money in his girlfriend's account at Santel Federal Credit Union to cover a check he had previously written to Suplee Reed for $113,375. He deposited other money from the investors into his own account at Bank of Commerce to cover a check he wrote to Paine Webber in the amount of $90,000. Not one of the investors ever received stock certificates issued in their name.

Deeb and Bayaa contend that this was not a fraudulent sale of stock because they never actually owned the stock, having bought it on margin. Rather, the investors were simply providing money to Deeb to purchase stock for them. According to Deeb, he was not selling the stock. We do not agree with this characterization of the transaction.

When Bayaa and Deeb could not cover the margin requirements, Bayaa represented to Twal that if he could come up with investors, they would receive stock certificates once *Deeb* received their money. Several of the investors testified at trial and indicated that they believed that Deeb was the seller, or that Deeb was the broker, or that Bayaa was the seller. None of them believed that they were purchasing stock from Paine Webber or Suplee Reed. Regardless, the investors were enticed to provide money to Deeb and were told he would then ensure that stock was issued in their names. This never happened. It is no defense to a charge of fraudulent sale of securities that the defendant did not actually own the stock at the time of the false representations. This is the essence of many fraudulent sales transactions.

Deeb put the money into accounts he controlled and kept the stock he purchased on margin in his name. The investors received nothing. A rational trier of fact, faced with this evidence, could easily conclude that a representation that stock cer-

tificates will be provided to an individual upon receipt of payment from that individual constitutes an offer for the sale of securities, and use of money received from an investor to keep those certificates in the seller's own name constitutes fraud in the sale of those securities.

## CONCLUSION

Because the Government provided sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that the money laundering statute covers the appellants' conduct in this case, their convictions on those counts were proper. We therefore AFFIRM the appellants' convictions on counts 29 and 31. We AFFIRM the appellants' remaining convictions in all respects.

AFFIRMED.