**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Julian GALINDO–GALLEGOS, aka Jose Reyes–Olague, aka Aurelio Garcia–Chairez, aka Jose Olague Reyes, Defendant–Appellant.**

**No. 99–50585.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 12, 2000

Filed March 27, 2001

As Amended April 25, 2001.

Debra A. DiIorio, DiIorio & Hall, San Diego, California, for the appellant.

Gregory A. Vega, U.S. Attorney, and Kevin J. Kelly, Assistant U.S. Attorney, San Diego, California, for the appellee.

Before: RYMER, KLEINFELD, and PAEZ, Circuit Judges.

Opinion by Judge KLEINFELD; Concurrence by Judge PAEZ

KLEINFELD, Circuit Judge:

This criminal appeal involves an issue of when a *Miranda* warning must precede questioning and how broadly the aggravated felony of alien smuggling sweeps.

### Facts

Two border patrol agents were looking for aliens about 1800 feet north of the Mexican border. They saw a large group of people running, assumed they were illegal aliens because of the location and the fact that they were running, and stopped them. One of the agents told the people to sit down on the ground. The other agent chased those who ran away. Among those he caught was the appellant, Galindo–Gallegos. Once they had the 15 or 20 people seated, an agent asked them what country they were from and whether they had a legal right to be in the United States. Galindo–Gallegos said that he was from Mexico and had no such right. The border patrol agents did not advise the group of their *Miranda* rights prior to this questioning. After Galindo–Gallegos admitted that he was an alien illegally present in the United States, he and others were handcuffed and put into one of the vehicles.

Galindo–Gallegos was charged (under one of his aliases) with being a deported alien found in the United States[1] and convicted after trial. He moved to suppress

---

1. *See* 8 U.S.C. § 1326.

his admissions, but his motion was denied and his admissions came into evidence. The trial judge made an express finding that his admissions in the field "are significant and material to my determination of alienage." Galindo–Gallegos had previously been convicted of "transportation of illegal aliens." [2] Based on that conviction, he received the 16–level upward adjustment under the sentencing guidelines [3] where the previous deportation followed conviction of an aggravated felony.

## Analysis

### I. Miranda.

Galindo–Gallegos argues that his admissions of alienage and being in the United States illegally should have been suppressed, because he was not advised of his Miranda [4] rights before he made them. He argues that he should be treated as having been in custody when he made them, because a reasonable person would not have felt free to leave. Because he tried to run away, and was caught and brought back, it was quite clear to him that he was in fact not free to leave. And, he argues, the border patrol officer expected the answers to her questions to be incriminating and expected to conclude that he was in the country illegally, because the group was spotted running just north of the border, and he tried to run away.

 The trial judge found that the officers "in no way coerced these people to talk" in the field, and the statements were voluntary. She also found that "these are questions that need to be routinely asked of individuals who are caught or apprehended near the border" and that the questions "really are designed to elicit

what could be ultimately incriminating evidence," but that the questioning did not require a prior Miranda warning. Whether a defendant was constitutionally entitled to a Miranda warning is an issue of law we review de novo.[5] Whether a person is "in custody" for purposes of Miranda is essentially a question of fact reviewed for clear error.[6]

We have decided many Miranda cases with language that seems to bear on various circumstances of this case, but few that are factually analogous. Quotations from cases, shorn of their factual context, are not much help in making a decision. We therefore focus on the cases with some factual similarity or usable analog. The material factual circumstances here are that (1) the questioning took place out of doors; (2) the location was isolated, away from view by the general public, but there were 15 or 20 aliens and only 2 law enforcement officials; (3) no one was handcuffed, but everyone was required to sit on the ground; (4) the questions were a necessary predicate to letting anyone go free, but were also reasonably likely to elicit incriminating admissions by those for whom the facts were incriminating; and (5) the group of aliens had been caught running in an area very near the border, and Galindo–Gallegos had persisted in running away from the border patrol but was caught and returned to the group that had been seated on the ground.

The critical Supreme Court decision is Berkemer v. McCarty.[7] The question there was whether roadside questioning of a motorist detained on a traffic stop amounted to custodial interrogation for purposes of Miranda. It was even more plain there than here that the motorist's

2. See 8 U.S.C. § 1324(a)(1)(A)(ii).

3. See U.S.S.G. § 2L1.2.

4. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. See United States v. Nieblas, 115 F.3d 703, 705 (9th Cir.1997).

6. See People of the Territory of Guam v. Palomo, 35 F.3d 368, 375 (9th Cir.1994).

7. 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

next stop was jail, because he was weaving all over the road and too impaired to perform a field sobriety test without falling down.[8] The officer decided as soon as he saw the man step out of his car, before he even talked to him, that he would be taken into custody.[9] And it was at least as plain that the officer's questions were likely to elicit incriminating answers. The officer asked the man if he had been using intoxicants, and he answered that he had drunk "two beers" and "smoked several joints of marijuana." [10]

Nevertheless, the Court held that roadside questioning of a motorist detained on a traffic stop was not custodial interrogation for purposes of *Miranda*.[11] There were two reasons. First, such traffic stops are "presumptively temporary and brief," because even if guilty of a traffic infraction, most people just get a traffic ticket and go on their way.[12] Second, and most important to this case, "the typical traffic stop is public." The importance of its being public is that "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse." [13] For these reasons the Court held that such questioning should be treated as within the category of a *Terry* stop,

not as custodial interrogation for *Miranda* purposes. The policeman's intent to arrest was immaterial, because subjective intention was immaterial. "The only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." [14] The hypothetical reasonable man is one who is not breaking the law in so serious a way that arrest is likely,[15] so even though a reasonable man as impaired as the driver in *Berkemer* would expect to get arrested and jailed if he was caught, he was treated as subject only to a *Terry* stop.[16]

We decided that a *Miranda* warning should have been given in another case of questioning in a remote location, *United States v. Beraun–Panez*.[17] Our reasons in that case highlight the factual differences between that case and the one before us. The differences and our *Beraun–Panez* reasoning show why we should apply the *Berkemer* analysis to the case at bar. In *Beraun–Panez*, we emphasized that the suspect was separated from his co-worker in a remote rural location,[18] while in *Berkemer* the questioning took place in public. We quoted the reason why *Berkemer* said that the public location mattered, that it "both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he

---

**8.** *See id.* at 423, 104 S.Ct. 3138.

**9.** *See id.*

**10.** *See id.*

**11.** *See id.* at 438–40, 104 S.Ct. 3138.

**12.** *See id.* at 437, 104 S.Ct. 3138.

**13.** *Id.* at 438, 104 S.Ct. 3138.

**14.** *Id.* at 442, 104 S.Ct. 3138.

**15.** *See United States v. Wauneka,* 770 F.2d 1434, 1438 (9th Cir.1985) (Defining reason-

able man in these circumstances as a "reasonable innocent person.").

**16.** We applied *Berkemer* to an analogous situation in *United States v. Montero–Camargo.* 177 F.3d 1113, 1121 (9th Cir.1999), *vacated,* 192 F.3d 946, *reinstated in pertinent part,* 208 F.3d 1122, 1128 n. 8 (9th Cir.2000) (en banc). That case involved a roadside stop of aliens illegally in the country. We held that no *Miranda* warning was necessary, following *Berkemer.* This opinion is in accord with the panel decision in *Montero–Camargo.*

**17.** 812 F.2d 578 (9th Cir.1987).

**18.** *See id.* at 581–82.

does not cooperate, he will be subjected to abuse." [19]

■ We should follow *Berkemer.* It is materially analogous. In the case at bar, there were two border patrol officers and 15 or 20 suspects who were stopped. Though not as public as a traffic stop on a busy street, it was public for the reason that mattered; no alien had reason to fear abuse by an officer and an unscrupulous officer would have been deterred from using illegitimate means by all the witnesses. The Supreme Court explained in *Miranda* that the new procedure it required was intended to guard against police brutality and the "third degree," so that the dignity and integrity of an individual is protected from police tactics designed to overcome a suspect's will.[20] There is not much risk of the harms *Miranda* protects against, either in the roadside stop circumstances of *Berkemer,* or the more rural stop here, because the public setting gives rise to a likelihood of witnesses to any misconduct. Where officers apprehend a substantial number of suspects and question them in the open prior to arrest, this is ordinarily a *Terry* stop, not custodial questioning, under *Berkemer.* Denial of the motion to suppress was proper.

II. *Sufficiency of evidence.*

■ Galindo–Gallegos argues that there was insufficient evidence that he was an alien, so his conviction for being an alien found in the United States after deportation cannot stand. There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[21]

Much of the evidence of alienage consisted of Galindo–Gallegos's repeated admissions that he was in fact an alien. But as his brief says, "this case is perhaps somewhat unusual in that the defense offered at trial was that the defendant, Mr. Galindo, was a proven liar." This defense was not frivolous. The defense put on evidence that Galindo–Gallegos had repeatedly lied, both under oath and not under oath, in his various immigration and deportation proceedings. And the defense obtained testimony from one of the border patrol agents that sometimes American citizens who face criminal charges falsely claim to be deportable aliens, because it is much better to be put on a bus to Mexico than sent to jail in the United States.

■ Nevertheless, the evidence was sufficient under the applicable standard. The trier of fact could decide to believe Galindo–Gallegos's admissions of alienage. A defendant's admissions that he is an alien, together with a deportation order, suffice to establish alienage.[22] Here, the government presented evidence of Galindo–Gallegos's prior deportation orders, his repeated admissions of alienage during the numerous prior deportation hearings, his admission of alienage at the scene of his apprehension, and the circumstances surrounding his apprehension, all of which together sufficiently would enable a rational trier of fact to conclude that alienage had been established beyond a reasonable doubt.

19. *Id.* (quoting *Berkemer,* 468 U.S. at 438, 104 S.Ct. 3138).

20. *See Miranda,* 384 U.S. 436, 447–49, 481–82, 86 S.Ct. 1602; *see also Arizona v. Mauro,* 481 U.S. 520, 529–30, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) (noting that purpose behind *Miranda* was "preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment").

21. *See United States v. Deeb,* 175 F.3d 1163, 1168 (9th Cir.1999).

22. *See United States v. Ramirez–Cortez,* 213 F.3d 1149, 1158 (9th Cir.2000); *United States v. Sotelo,* 109 F.3d 1446, 1449 (9th Cir.1997); *United States v. Contreras,* 63 F.3d 852, 858 (9th Cir.1995).

## III. *Aggravated felony.*

■ Galindo–Gallegos's sentencing guideline level was adjusted upward 16 levels based on his prior conviction for an aggravated felony.[23] The predicate felony was a conviction for transporting aliens within the United States, knowing that they were there illegally and in furtherance of the illegal entry or presence.[24] The conviction was not for smuggling aliens into the country, just for transporting them after they were in. The guideline refers to the statute defining aggravated felonies,[25] and the statute has a parenthetical phrase referring to "smuggling."[26] Because Galindo–Gallegos was convicted only of transporting illegal aliens who were already in the United States, not of smuggling them in, he argues that the enhancement was improperly applied to him. We review de novo whether the aggravated felony adjustment is applicable to the statute of conviction.[27]

The statute on "bringing in and harboring aliens"[28] criminalizes numerous categories of conduct. The first section applies to one who brings an alien to the United States at a place other than a proper port of entry.[29] The second applies to one who knowingly transports an illegal alien within the United States.[30] The aggravated felony statute refers to both of these sections, and then has the parenthetical "relating to alien smuggling."[31]

Appellant argues, correctly, that we use a "categorical" analysis, which is to say, we look at the statute, not the conduct that was the basis for conviction.[32] He then argues that because the aggravated felony statute expressly uses the parenthetical phrase "relating to smuggling," and his offense of conviction consisted only of transporting aliens already in the United States and not smuggling them across the border, the aggravated felony provision excludes him from coverage.

■ We reject Galindo–Gallegos's reading, because it does not make sense of all the words of the statute. All subsection (ii) "transporting" offenses involve aliens who are already in the United States. The aggravated felony provision expressly includes subsection (ii) "transporting" of-

23. *See* U.S.S.G. § 2L1.2.

24. *See* 8 U.S.C. § 1324(a)(1)(A)(ii).

25. *See* 8 U.S.C. § 1101(a)(43).

26. *See* 8 U.S.C. § 1101(a)(43)(N) which includes as an aggravated felony "an offense described in paragraph (1)(A) or (2) of [8 U.S.C. § 1324(a)] (relating to alien smuggling). . . ."

27. *See United States v. Estrada–Torres,* 179 F.3d 776 (9th Cir.1999).

28. *See* 8 U.S.C. § 1324.

29. *See* 8 U.S.C. § 1324(a)(1)(A)(i) which applies criminal penalties to any person who:
[K]nowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authoriza-

tion to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien.

30. *See* 8 U.S.C. § 1324(a)(1)(A)(ii) which applies criminal penalties to those who:
[K]nowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law.

31. *See* 8 U.S.C. § 1101(a)(43)(N) which includes as an aggravated felony "an offense described in paragraph (1)(A) or (2) of [8 U.S.C. § 1324(a)] (relating to alien smuggling). . . ."

32. *See United States v. Bustamante Lomas,* 30 F.3d 1191, 1193 (9th Cir.1994).

fenses. Therefore the aggravated felony provision has to include transporting aliens who are already in the United States. Also, the subsection (ii) "transporting" offense requires, as one of its elements, "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law." Thus all the aliens who can be the predicate of a "transporting" offense under subsection (ii) are known to the offender not to be entitled to be here. That means that, except perhaps for some who came in legally but overstayed their visas, a subsection (ii) transporter knows that his conduct "relates" to alien smuggling. And that is just what the aggravated felony parenthetical says, "relating" to smuggling.

Moreover, in other subsections, Congress used a perfectly clear approach to articulate a limiting rather than descriptive parenthetical. For example, in subsection J, there is a descriptive parenthetical using the same "relating to" form as the subsection N parenthetical at issue in this case, followed by a limiting parenthetical, "if it is a second or subsequent offense."[33] Subsection J can only be read as using the "relating to" language as descriptive and the "if" language as limiting, so there is no reason to doubt that Congress meant the "relating to" language in N to be descriptive as well.[34] The function of the descriptive language appears to be to make reading the statute easier, so that one does not have to look up each citation to see what it is about, and to protect against scrivener's error in getting the

statute from the drafting desk to the United States Code.

Therefore, the straightforward reading of the parenthetical in the aggravated felony statute, "relating to alien smuggling," is that it merely describes and does not limit subsection (ii) "transporting" offenses that may be a predicate for the aggravated felony.[35] The Fifth Circuit is the only other circuit to have considered this question, and it has read the statute just as we do.[36]

### Conclusion

Thus we conclude that such preliminary questioning of suspects in the field prior to arrest, where the setting is for all practical purposes public, as took place here, does not constitute custodial interrogation. The evidence of alienage was sufficient. And transporting aliens under 8 U.S.C. § 1324(a)(1)(A)(ii) is an aggravated felony under 8 U.S.C. § 1101(a)(43)(N) for purposes of U.S.S.G. § 2L1.2.

AFFIRMED.

PAEZ, Circuit Judge, concurring:

I agree with the majority's conclusion that Galindo–Gallegos' admissions of alienage and being in the United States illegally should not have been suppressed, as well as with the majority's analysis of the evidentiary and aggravated felony issues. I write separately because I disagree with the majority's assertion that this stop "was public for the reason that mattered; no alien had reason to fear abuse by an officer and an unscrupulous officer would have

---

**33.** See 8 U.S.C. § 1101(a)(43)(J) which reads:

"[A]n offense described in section 1962 of title 18, United States Code (*relating to* racketeer influenced corrupt organizations), or an offense described in section 1084 (*if it is a second or subsequent offense*) or 1955 of that title (*relating to* gambling offenses), for which a sentence of one year imprisonment or more may be imposed"
(emphasis added).

**34.** See id.; see also 8 U.S.C. § 1101(a)(43)(F) which reads "a crime of violence (as defined

in § 16 of Title 18, *but not including* a purely political offense) for which a term of imprisonment is at least one year." (emphasis added).

**35.** We need not deal in this case with the hypothetical case of one who transports an alien knowing that the alien has overstayed his or her visa, because that case is not before us.

**36.** See *United States v. Monjaras–Castaneda*, 190 F.3d 326 (5th Cir.1999).

been deterred from using illegitimate means...." Maj. op. at 732 (citing *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). I doubt that the mere presence of other suspected illegal aliens offered Galindo–Gallegos much solace or protection. Nonetheless, I concur because, in my view, the agents' detention of Galindo–Gallegos and the rest of the group near the border constituted a permissible *Terry*[1] stop. The detention was brief and the limited restraint was reasonable under the circumstances. Because the agents' questions did not exceed the scope of allowable inquiry during such a stop, *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), Galindo–Gallegos' answers were admissible.

Border Patrol agents may briefly stop individuals based on reasonable suspicion that the individuals are aliens in this country illegally, *id.* at 884, 95 S.Ct. 2574, in order to investigate the circumstances that provoked that suspicion. *Id.* at 881, 95 S.Ct. 2574. Officers are not required to read suspects their *Miranda*[2] rights prior to questioning them during a *Terry* stop. *See, e.g., United States v. Woods*, 720 F.2d 1022, 1029 (9th Cir.1983). As long as the detention in this case did not exceed the limited bounds of a *Terry* stop and the questions were " 'reasonably related in scope to the justification for their initiation,' " *Brignoni–Ponce*, 422 U.S. at 881, 95 S.Ct. 2574 (quoting *Terry*, 392 U.S. at 29, 88 S.Ct. 1868), then Galindo–Gallegos' admissions should not be suppressed.

The most vexing question is whether *Miranda* warnings were required after Galindo–Gallegos tried to run away from the officers, was chased and caught, and was brought back, made to sit in a circle, and questioned. Maj. op. at 730. One might suspect that, after being caught and returned to the circle, Galindo–Gallegos did not feel free to leave. There is no per se rule, however, that physical detention

converts an investigatory stop into a custodial interrogation. *See, e.g., United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) ("A brief but complete restriction of liberty if not excessive under the circumstances, is permissible during a *Terry* stop and does not necessarily convert the stop into an arrest."). We have approved of *Terry* stops that include handcuffing the suspect during questioning, *see id.* at 1289–90; *United States v. Meza–Corrales*, 183 F.3d 1116, 1123–24 (9th Cir.1999); ordering a suspect to lie prone on the ground, or placing the suspect in a police vehicle, *see Allen v. Los Angeles*, 66 F.3d 1052, 1056 (9th Cir.1995) (citing *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987), and *United States v. Taylor*, 716 F.2d 701 (9th Cir.1983)). It is not out of the bounds of a *Terry* stop, under appropriate circumstances, to order suspects to sit on the ground in a circle. Furthermore, we have approved of more significant restraint during a *Terry* stop when suspects have fled. *See Meza–Corrales*, 183 F.3d at 1123–24.

The fact that the Border Patrol agents stopped the fleeing suspects and brought them back to the circle also did not transform the detention into a custodial interrogation. During an investigatory stop, officers are authorized to physically move suspects if necessary. Of particular relevance is our decision in *Martinez v. Nygaard*, 831 F.2d 822 (9th Cir.1987). There, we held that a permissible investigative stop included "taking [a suspected alien] by the arm, [leading] her to an area where other suspected aliens were being held[,]" not permitting her to leave that area to use a telephone, and "warn[ing] her that if she moved again [the officer] would tie her hands." *Id.* at 825, 827–28. The stop in this case involved no more physical restraint than that involved in *Martinez*. In sum, Galindo–Gallegos was not in custody, or under arrest, merely

---

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

because he had been caught and returned to the group for questioning.

Under the Supreme Court's decision in *Brignoni–Ponce,* Border Patrol agents may question suspected illegal aliens "about their citizenship and immigration status, and . . . may ask them to explain suspicious circumstances. . . ." 422 U.S. at 881–82, 95 S.Ct. 2574. The questions the agents asked Galindo-Gallegos in this case were what country he was from and whether he had a legal right to be in the United States. Maj. op. at 729. Those questions were directly related to the agents' reason for stopping the group in the first place, a suspicion that they were illegal aliens. Furthermore, the agents "used no threats of force, unnecessary delays, exaggerated displays of authority or other coercive tactics" in their questioning. *United States v. Torres–Sanchez,* 83 F.3d 1123, 1129 (9th Cir.1996) (holding that there was no arrest when suspect was moved from his own truck to a police car). The agents' questions were permissible and the district court's order denying Galindo–Gallegos' motion to suppress was proper.