**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Armando HERNANDEZ–GARCIA,**
**Defendant–Appellant.**

**No. 00–50634.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 9, 2001.

Filed March 26, 2002.

As Amended on Denial of Rehearing and Rehearing En Banc May 9, 2002.*

---

* Judges RYMER and RAWLINSON vote to deny the petition for rehearing en banc and

Judge POGUE so recommends.

Angela M. Krueger, Federal Defenders of San Diego, Inc., San Diego, CA, for the defendant-appellant.

Mark R. Rehe, Assistant United States Attorney, San Diego, CA, for the plaintiff-appellee.

Before RYMER and RAWLINSON, Circuit Judges, and POGUE, Judge.**

Opinion by Judge RYMER; Dissent by Judge RAWLINSON

RYMER, Circuit Judge.

Armando Hernandez Garcia appeals his conviction by jury for two counts of transporting illegal aliens within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). His appeal turns on whether "entry"—and thus presence in this country free of official restraint—is required to sustain the conviction of a transporter. We conclude that it is not. Otherwise we see no reversible error, and affirm.

I

On January 24, 2000 Agent Dennis Basse was flying a United States Border Patrol airplane over the United States–Mexico border in the desert east of El Centro, California.[1] Flying at 9,000 to 10,000 feet, he spotted several vehicles on the Mexico side in an area called the "Sand Pit" or "Gravel Pit." It is an area where smuggling happens daily. About 9 a.m., three of the vehicles began driving north.

---

** Honorable Donald C. Pogue, United States Court of International Trade Judge, sitting by designation.

1. There is a conflict in the record regarding whether the aircraft involved in the surveillance was a helicopter or an airplane. The specific nature of the aircraft does not affect our decision in this case.

Through his binoculars, Basse could discern a white van, light blue van, and a Ford Bronco. He radioed Agent Serna, who was patrolling on foot in the general area, with the vehicle descriptions; Serna then got in his car and drove east on Interstate 8 in the direction of the Sand Pit. All three vehicles crossed the border and headed toward I-8 (about a quarter-mile away). No agent saw them cross, except for Basse who was in the airplane.

The vehicles drove through a fence, already smashed-down, on the side of the freeway. The white van drove across the eastbound lanes of I-8, and across the median, to the west-bound lanes. The blue van and Bronco went east. Up to this point there were no agents on the ground to stop the vehicles. Serna first spotted the white van as it crossed the median. After confirming with Basse that the white van was the van that had crossed the border, Serna got into the westbound lanes and followed it at a distance of seven to eight car lengths. Meanwhile, Serna radioed for other agents to set up a tire deflation device, or "spike mat," which they did. The tire deflation device is a retractable plastic strip with 100 plastic, hollow, cylindrical spikes with metal tips about ⅟₁₆ inch wide. It is deployed by pulling a rope and stretching it across the road. The mat was laid down four to five miles from the border crossing.

As the van approached the mat, Serna pulled closer and activated flashing emergency lights. The van applied its brakes and tried to steer around the mat, but the left tire caught and eventually deflated. Serna went up to the van after it had come to a stop, saw Hernandez Garcia behind the steering wheel, and noticed that the van was full of people (fifteen, as it turned out).

Hernandez–Garcia was arrested and indicted. He moved to suppress evidence adduced on account of use of the spike mat, which was denied; and for a judgment of acquittal on the footing that he was never free from official restraint. The district court originally held that Hernandez–Garcia was not under official restraint, and that the transportation statute does not require that he be, but later decided to instruct the jury on that theory. The jury found Hernandez–Garcia guilty of two counts of transporting illegal aliens. The court denied Hernandez–Garcia's renewed motion for acquittal, and sentenced him to two concurrent 20 month terms.

Hernandez–Garcia timely appeals.

## II

■■ Hernandez–Garcia argues for reversal because there was insufficient evidence to establish that he and the undocumented Mexican nationals in the white van "entered" the United States. His premise is that the van was always under surveillance, thus was never free of official restraint and so did not "enter" this country. He contends that § 1324(a)(1)(A)(ii) requires the government to prove an "entry" for two reasons. First, aliens do not enter the country simply by crossing the border; "an entry, as defined legally, is required before a person is 'found in' the United States." *United States v. Pacheco–Medina*, 212 F.3d 1162, 1166 (9th Cir.2000) (construing the "found in" offense set forth in 8 U.S.C. § 1326). Second, the statute does not criminalize the transportation of an alien in Mexico, therefore an "entry" must be established before a person can be convicted of transporting aliens in the United States. For this he relies on *United States v. Aguilar*, 883 F.2d 662, 682 (9th Cir.1989), which noted that a "bring into" conviction under former § 1324(a)(1) requires the alien to enter the United States. However, we disagree that "entry" is required for purposes of § 1324(a)(1)(A)(ii);

rather, the statute can be violated by transporting an alien who has "come to" the United States unlawfully.

Section 1324(a)(1)(A)(ii) provides:

(1)(A) Any person who—

.    .    .    .    .

(ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

.    .    .    .    .

shall be punished. . . .

On its face the statute prohibits transportation within the United States of an alien who has "come to, entered, or remains in the United States." These are disjunctive concepts. The crime is the *transportation* of an illegal alien within this country, not the alien's reentry. So long as an alien has come to the United States unlawfully and the transporter knows this (or recklessly disregards this fact), and the alien is transported within the United States, it is immaterial whether the *alien* has technically "entered" the country or not. Put differently, what matters is that the aliens in the white van *came to* the United States, and that Hernandez–Garcia knew (or should have known) that they had no right to be here when he transported them on an interstate highway this side of the border.

The revisions made to Title 8 of the U.S. Code in 1986 and the corresponding legislative history for 8 U.S.C. § 1324 support this interpretation. Prior to 1986, the un

lawful transportation subsection of § 1324 provided:

Any person, including the owner, operator, pilot, master, commanding officer, agent or consignee of any means of transportation who—. . . (2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law; . . . any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States. . . .

8 U.S.C. § 1324(a)(2) (Supp. 1986). The portions of this version which required proof of "entry," *United States v. Pruitt,* 719 F.2d 975, 977 (9th Cir.1983), were removed during the 1986 revisions and were replaced with language requiring "that an alien has come to, entered, or remains in the United States in violation of law." 8 U.S.C. § 1324(a)(1)(A)(ii).

Although the legislative history is silent on this particular change, the discussion on smuggling and related offenses in § 1324 indicates that Congress intended to separate the concept of bringing or coming *to* the United States from "entry." For example, the House Report reflects disagreement with the judicial interpretation of the former version of § 1324(a)(1) that had equated "bring *into*" with entry. H.R. Rep. No. 99–682(I), at 65–66 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5669–70 (legislatively overruling *United States v. Anaya,* 509 F.Supp. 289 (S.D.Fla.1980)).[2]

**2.** It was this prior version of the statute that we were concerned with in *Aguilar,* 883 F.2d at 680, when we held that transportation of

illegal aliens under § 1324(a)(1) required "entry."

Accordingly, this section was amended from "bring *into*" to "bring *to.*" §§ 1324(a)(1)(A)(i), 1324(a)(2) (recodifying § 1324(a)(1) (1986)) (emphasis added). Whether or not "bring *into*" was properly construed as synonymous with "entry," bring *to*—and come *to*—cannot be.

In a variation on the theme, Hernandez–Garcia argues that a defendant may only be convicted under § 1324(a)(1)(A)(ii) if he transports an alien *within* the United States, and he can't be transporting others *within* the United States if neither he nor they "entered" the country. But it seems clear to us that Hernandez–Garcia was driving the white van on an interstate highway north of the Mexican border and south of the Canadian border, that is, within the United States (whether or not the aliens who were his passengers were "in" the United States for purposes of the immigration laws). Hernandez–Garcia contends that *United States v. Galindo–Gallegos*, 244 F.3d 728 (9th Cir.2001) (as amended), suggests otherwise, but we do not agree. Galindo–Gallegos argued that his prior conviction for transporting aliens did not relate to alien smuggling because he did not actually smuggle aliens across the border. We held that the aggravated felony provision includes transporting offenses, and has to include transporting aliens who are already in the United States. We said nothing about whether "entry" was required for the underlying offense, but we did observe that "all the aliens who can be the predicate of a 'transporting' offense under subsection (ii) are known to the offender not to be entitled to be here." *Id.* at 733–34. There is no question that this was true of the aliens whom Hernandez–Garcia transported.

In sum, we believe that "come to" in § 1324(a)(1)(A)(ii) means just what it says, come *to* the United States, not come *into* or enter the United States. For this rea-son, it suffices for the government to show that the transporter drove an alien within this country who had come to the United States unlawfully. Here, there is no dispute that Hernandez–Garcia knew that the aliens in the white van who had come to the border were undocumented, and he transported them on I–8. A rational jury could find beyond a reasonable doubt that he was guilty of the offense charged.

■ However, there is a further wrinkle we must consider, because the district court instructed the jury that proof of entry was required. Hernandez–Garcia maintains that even if we were to conclude (contrary to his position) that "entry" is not required, we cannot affirm because the jury was not instructed on a "come to" theory. While literally correct, the instructions went beyond what was required so the error, if any, was harmless. The jury was correctly instructed (in accordance with the Ninth Circuit Model Jury Instructions: Criminal § 9.2 (2000)) that the government must prove beyond a reasonable doubt that each alien "was not lawfully in the United States" and that the defendant knew or was in reckless disregard of the fact that each was "an alien who was not lawfully in the United States." The difficulty is that the instructions required the government also to prove that the aliens had "entered" the United States. In other words, to convict under the court's instructions, the jury had to find that the transported aliens were not under official restraint, as defined by the court, from the time they crossed the border until they were apprehended. Whether or not this is correct, having found entry, as defined by the court, the jury necessarily found that the aliens had "come to" the United States unlawfully because to come *to* the United States is a step subsumed by the court's definition of "entry." Thus, the official restraint in-

structions were superfluous. *See United States v. McCown,* 711 F.2d 1441, 1452 (9th Cir.1983) (having found no substantial evidence of entrapment, instruction on entrapment was merely superfluous).

Given our conclusion that entry is not required for conviction under § 1324(a)(1)(A)(ii), we need not reach the further question whether, if it were, the jury was properly instructed on what constitutes official restraint.

## III

■■■ Hernandez–Garcia submits that the agents lacked probable cause to stop him, and that use of the spike mat was excessive force. Following an evidentiary hearing, the district court found that there was probable cause, which there was. The agents had seen the white van and two others come across the border in an area frequently used by alien smugglers, at a place not designated as a point of entry, then cross traffic onto the interstate over the median, not at an entryway, and proceed west in a hurry. We see no basis for invalidating the arrest, or suppressing evidence, on account of use of the spike mat. Hernandez–Garcia alludes to the knock-and-announce rule, but offers no reason why it should apply to vehicle stops. Nor, apart from *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), which concerns the unreasonable use of force for purposes of a civil lawsuit, does he suggest any reason for suppressing evidence because a spike mat was used.

AFFIRMED.

RAWLINSON, Circuit Judge, Dissenting.

I respectfully dissent.

The district court gave this instruction as to count three of the indictment:

That on or about January 24th, 2000, within the Southern District of California, the Defendant, Armando Hernandez–Garcia, with the intent to violate the immigration laws of the United States, knowing and in reckless disregard of the fact that an alien, namely Daniel Ibanez–Pizano, had come to, entered, **and** remained in the United States in violation of law, did transport and move said alien within the United States in furtherance of such violation of law. (Emphasis Added).

The district court similarly instructed the jury on count four of the indictment which charged the same offense, but named alien Manuel Vargas–Amezcua as the alien transported.

The district court also instructed the jury on the elements of transporting illegal aliens in violation of section 1324(a)(1)(A)(ii) as follows, in pertinent part:

In order for the Defendant to be found guilty of the charges in Counts 3 and/or 4, the Government must prove each of the following elements beyond a reasonable doubt:

First, that the person specified in the particular Count, Daniel Ibanez–Pizano and/or Manuel Vargas–Amezcua, was an alien on January 24th, 2000;

Second, that on January 24th, 2000, Daniel Ibanez–Pizano and/or Manuel Vargas–Amezcua was not lawfully in the United States;

Third, that the Defendant knew or was in reckless disregard of that fact that Daniel Ibanez–Pizano and/or Manuel Vargas–Amezcua was an alien who was not lawfully in the United States;

Fourth, that on or about January 24, 2000, the defendant knowingly

transported or moved Daniel Iba-nez–Pizano and/or Manuel Vargas–Amezcua within the Southern District of California with the specific purpose of helping him remain in the United States illegally; and,

Fifth, that the Defendant acted with the intention of violating the immigration laws of the United States.

.     .     .     .     .

The third element of the charge requires the Government to prove either; one, that the Defendant knew that the specified alien was an alien who had not received prior official authorization to come to, enter, or reside in the United States; or that the Defendant acted in reckless disregard of the fact that the specified alien was an alien who had not received prior official authorization to come to, enter, or reside in the United States....

The court instructed on official restraint as follows:

In order for the defendant to be found guilty of the offenses charged in Count 3 and 4, the Government must prove beyond a reasonable doubt that the defendant transported the aliens who were not lawfully in the United States. **Each count requires proof that the alien had entered the United States.** (Emphasis added).

An alien who is under "official restraint," although physically present on American soil, has not entered the United States in the legal sense. Thus, if the aliens in the white van were continuously under "official restraint" from the time that they crossed the border until they were apprehended, they had not entered the United States within the meaning of the statutes under which the defendant is charged in the indictment.

"Official restraint" means that the aliens were effectively deprived of their liberty and prevented from going at large within the United States.

In order for an alien to be deemed not to have yet entered the United States under this rule of law, the alien must be under the official restraint at all times during and subsequent to the alien's physical entry into [sic] the United States [sic] soil. However, an alien who is able to exercise his free will subsequent to physically crossing the border is not under official restraint. Constant observation and surveillance of the alien by an agent who is reasonably able to apprehend the alien after the alien has crossed the border constitutes official restraint. The constant surveillance must be of such a degree that it would prevent the alien from escaping into the general population of the United States.

It is for you, as the finders of fact, to determine whether the Government has proved beyond a reasonable doubt that the aliens were not continuously under "official restraint" from the time that they crossed the international border until their apprehension.

In making that determination, you may consider whether the aliens were under surveillance by authorities, whether that surveillance was continuous, the distance the authorities were from the aliens, the amount of time the aliens were physically present within the United States prior to apprehension, the distance the aliens traveled into the United States, the characteristics of the area in which the aliens crossed the border, and any other factor that bears on the issue.

Under normal circumstances, a conviction for violating section 1324(a)(1)(A)(ii) requires proof that: 1) an alien has come to, entered or remained in the United States in violation of the law; 2) the defendant

either had personal knowledge of or acted in reckless disregard of the fact that the alien had unlawfully come to, entered or remained in the United States; 3) the defendant transported or moved or attempted to transport or move the alien within the United States; and 4) the defendant acted in furtherance of the alien's violation of the law.

However, the Government concedes that the jury was not instructed that Hernandez–Garcia could be convicted if the aliens with Hernandez–Garcia had merely "come to" the United States. Instead, the jury was expressly instructed that in order to convict Hernandez–Garcia the jury would have to find that the undocumented Mexican nationals "entered the United States."

The majority holds that the official restraint instructions were superfluous "because to come *to* the United States is a step subsumed by 'entry'." (Emphasis in the original). However, this reasoning is circuitous because entry can only be found if there is an absence of official restraint. *See United States v. Ruiz–Lopez*, 234 F.3d 445, 448 (9th Cir.2000).

The majority's holding also ignores the fact that the indictment charged that the aliens "had come to, entered, **and** remained in the United States." (Emphasis added). Hernandez–Garcia was constitutionally entitled to have each element of the offense presented to the jury in the instructions. *See McCormick v. United States*, 500 U.S. 257, 269–70, 270 n. 8, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991); *see also United States v. Wiseman*, 274 F.3d 1235, 1241–42 (9th Cir.2001).

The official restraint instructions are problematic for an additional reason not discussed by the majority: they were erroneous. They required observation "by an agent who is reasonably able to apprehend the alien," a concept which appears nowhere in this circuit's jurisprudence.

Equally important, the instructions allowed the jurors to consider other factors we have not recognized, including:

> "... the distance authorities were from the aliens, the amount of time the aliens were physically present within the United States prior to apprehension, the distance the aliens traveled into the United States, the characteristics of the area in which the aliens crossed the border **and any other factor that bears on the issue.**" (Emphasis added).

Faced with these nebulous and erroneous instructions, I cannot comfortably rely on any finding of entry made by the jury in this case. In *Ruiz–Lopez*, we explained that to "enter" or be "found" an alien must be present in the United States free from official restraint. 234 F.3d at 448. Official restraint is construed "broadly to include constant government surveillance of an alien, regardless of whether the alien was aware of the surveillance or intended to evade inspection." *Id.* (citation omitted). "If a government official has an alien under surveillance from the moment he passes the port of entry until the moment of arrest, the alien has not 'entered' the United States—even if his arrest occurred at a point well past the port of entry—because the alien was under official restraint the whole time." *Id.* Notably, we did not require surveillance by the same agent who apprehends the alien.

The evidence presented at trial indicated that the aliens with Hernandez–Garcia were under constant surveillance either by the Pilot or Agent Serna from the time they crossed the border until the time of the arrest. The aliens, therefore, could not have entered the United States. Because the aliens had not entered the United States, Hernandez–Garcia could not have been guilty of transporting them

within the United States. Accordingly, I would REVERSE.