**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                *Plaintiff-Appellee,*

v.

ROBERTO CERVANTES-FLORES,
                *Defendant-Appellant.*

No. 04-50113

D.C. No.
CR-03-00484-TJW

OPINION

Appeal from the United States District Court
for the Southern District of California
Thomas J. Whelan, District Judge, Presiding

Argued and Submitted
May 4, 2005—Pasadena, California

Filed August 24, 2005

Before: James R. Browning, Raymond C. Fisher and
Jay S. Bybee, Circuit Judges.

Per Curiam Opinion

**COUNSEL**

Robert H. Rexrode, III, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

Steven E. Stone, Assistant United States Attorney-Criminal Division, San Diego, California, for the plaintiff-appellee.

**OPINION**

PER CURIAM:

  Roberto Cervantes-Flores ("Cervantes") appeals his conviction and sentence for being found in the United States after

deportation in violation of 8 U.S.C. § 1326. Cervantes argues that the district court erred in: (1) denying him the opportunity to present a necessity defense to the jury; (2) refusing to exclude statements he made to a border patrol agent before receiving *Miranda* warnings; (3) admitting a certificate of nonexistence of record in violation of his Sixth Amendment Confrontation Clause rights in light of *Crawford v. Washington*, 541 U.S. 36 (2004) — a question of first impression for this circuit; (4) failing to instruct the jury correctly on one of the essential elements of the crime; and (5) enhancing his sentence based on facts neither pled nor found by a jury. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm Cervantes' conviction, but remand his sentence pursuant to *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005).

## I.

In May 1998, United States Border Patrol agents found Cervantes in the United States without proper documentation. He was convicted of improper entry by an alien under 8 U.S.C. § 1325, sentenced to 48 months in custody and removed from the United States from Hidalgo, Texas on January 28, 2003.

One week later, Border Patrol Agent Jason Wardlow reapprehended Cervantes early in the morning near Tecate, California. Wardlow noticed Cervantes walking along the side of a highway and then observed him notice the marked border patrol vehicle and flee. Wardlow jumped from his vehicle and chased Cervantes into the desert for approximately three-quarters of a mile. Upon catching up with him, Wardlow subdued and handcuffed him. Without giving any *Miranda* warning, Wardlow then asked Cervantes his citizenship, whether he had immigration documents allowing him to be in the United States, and how he crossed the border. Cervantes admitted he was a citizen of Mexico, lacked permission to be in the United States and had entered illegally. Wardlow then

walked Cervantes back to Wardlow's vehicle and took him to the Temecula border patrol station.

At the station, Agent Alex Markle advised Cervantes of his *Miranda* rights, and Agent Nicola Weiss questioned him. Cervantes again admitted he was a citizen of Mexico who had entered the United States without permission. He signed a "Record of Sworn Statement" summarizing his statements.

In October 2003, a jury convicted Cervantes of being a deported alien found within the United States without the consent of the Attorney General, in violation of 8 U.S.C. § 1326. The district court later sentenced him to 96 months imprisonment. Cervantes timely appealed his conviction and sentence to this court.

## II.

## A. Necessity Defense Properly Excluded

Cervantes appeals the district court's preclusion of his necessity defense at trial. We review the ruling de novo and hold that the district court did not err. *United States v. Arellano-Rivera*, 244 F.3d 1119, 1125 (9th Cir. 2001).

**[1]** The district court need not submit a defense to the jury where the proffered evidence, construed most favorably to the defendant, would fail to establish all elements of that defense. *See United States v. Dorrell*, 758 F.2d 427, 430 (9th Cir. 1985). "The sole question presented in such situations is whether the evidence, as described in the defendant's offer of proof, is insufficient as a matter of law to support the proffered defense. If it is, then the trial court should exclude the defense and the evidence offered in support." *Id.*

**[2]** An offer of proof sufficient to support a necessity defense must permit a reasonable jury to conclude:

(1) that [the defendant] was faced with a choice of evils and chose the lesser evil; (2) that he acted to prevent imminent harm; (3) that he reasonably anticipated a causal relation between his conduct and the harm to be avoided; and (4) that there were no other legal alternatives to violating the law.

*Arellano-Rivera*, 244 F.3d at 1125-26 (internal quotation marks omitted). "If the defendant's offer of proof is deficient with regard to any of the four elements, the district judge must grant the motion to preclude evidence of necessity." *Id.* at 1126 (internal quotation marks omitted).

[3] The evidence proffered here did not suffice to support a necessity defense as a matter of law. A doctor told Cervantes in the fall of 2002 that he was HIV positive and instructed him to begin making end-of-life decisions. At the time, Cervantes had not been in contact with his children since 1990 and no longer knew where in the United States they lived. Once removed to Mexico, he sought but did not receive help locating his children from an official at the United States consulate in Tijuana. Cervantes re-crossed the border with the intent of traveling to his children's last known place of residence. He believed he had no legal means of entering the United States because customs officials had informed him at the time of his removal that he was not eligible to return under the ordinary application process.

The district court found the offer of proof insufficient because it failed to demonstrate imminent harm. "There was no threat of [im]minent death or serious bodily injury. Your offer of proof was he was diagnosed HIV positive. While he may have a more limited life span than others, there is no indication whatsoever that his threat of death or serious bodily injury was [im]minent, which is what the law required." SER 331.

**[4]** We agree with the district court that Cervantes' testing positive for HIV did not constitute imminent harm. He failed to demonstrate that the disease created a threat of death or other serious, immediate harm.[1] For the same reason, Cervantes did not show that he was in imminent danger of losing his final opportunity to speak to his children. Accordingly, the district court did not err in precluding a necessity defense.

## B.  Suppression of Statements Made Prior to Miranda Warning

Cervantes appeals the district court's refusal to suppress statements that he made before he received a *Miranda* warning. We review denial of a motion to suppress de novo, *United States v. Moreno-Flores*, 33 F.3d 1164, 1168 (9th Cir. 1994), as well as whether a defendant is in custody for *Miranda* purposes. *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002).

**[5]** Agent Wardlow had reasonable suspicion to stop Cervantes. While walking along a highway known to be a smuggling route approximately 40 miles north of the United States border, Cervantes saw Wardlow's marked vehicle and immediately turned and attempted to flee. "Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop [someone] in the border area . . . . [B]ehavior may be relevant, as . . . obvious attempts to evade officers can support a reasonable suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[I]t was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.").

---

[1]On appeal, Cervantes adds that he needed medication that he could not obtain in Mexico. As Cervantes did not include this argument in his proffer before the district court, we do not address it here.

**[6]** Given that Wardlow had reasonable suspicion to make a *Terry* stop, he could ask Cervantes questions "reasonably related in scope to the justification for their initiation." *Terry v. Ohio*, 392 U.S. 1, 29 (1968). An "officer may question [individuals reasonably detained near the border] about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." *Brignoni-Ponce*, 422 U.S. at 881-82. Wardlow asked Cervantes about his place of birth, his citizenship, whether he had permission to be in the United States and how he had crossed into the United States. These questions were reasonably limited in scope to determining whether Cervantes had crossed the border illegally. Cervantes sought to suppress only his statements made in response to Wardlow's questions, and he conceded no one asked him additional questions until after Agent Markle read him his *Miranda* rights.

**[7]** By handcuffing Cervantes, Agent Wardlow did not convert the *Terry* stop into a custodial arrest. "Handcuffing a suspect does not necessarily dictate a finding of custody." *United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1981). Where a suspect threatens physical danger or flight, officers may use handcuffs in the course of a *Terry* stop. *See Washington v. Lambert*, 98 F.3d 1181, 1189 (9th Cir. 1996) ("[W]e have only allowed the use of especially intrusive means of effecting a stop in special circumstances, such as . . . where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight . . . ."); *United States v. Bautista*, 684 F.2d 1286, 1289-90 (9th Cir. 1982). Cervantes led Agent Wardlow on a chase away from his car into the desert. Doing so both increased the risk to Wardlow and demonstrated an intention to evade arrest. Under these circumstances, Wardlow's use of handcuffs was justified.

**[8]** In sum, Wardlow had reasonable suspicion to make an initial *Terry* stop. He limited the scope of his questions to investigating that suspicion alone. His use of handcuffs was

justified by Cervantes' flight and Wardlow's safety concern and thus did not convert the stop into a custodial arrest. Accordingly, we hold that the district court did not err in admitting the statements Cervantes made in response to Agent Wardlow's questions.

## C.   Admissibility of Certificate of Nonexistence of Record

Cervantes also appeals the district court's order denying his motion to exclude from evidence a certificate of nonexistence of record ("CNR") submitted by the government to prove that Cervantes had not received the Attorney General's consent to reenter the United States. *See* 8 U.S.C. § 1326(a)(2)(A) (providing that any alien who is found in the United States after having been deported or removed is guilty of an offense under § 1326 unless, "prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission").[2] The CNR, prepared by the Immigration and Naturalization Service ("INS") and introduced into evidence by the government, stated:

> I, *Ruth E. Jones*, certify to the following. . . . That after a diligent search no evidence is found to exist in the records of the Immigration and Naturalization Service of the granting of permission for admission

[2] The CNR, like the jury instruction challenged below, does not precisely mirror the language of § 1326. The CNR certifies that no evidence existed in the INS files that the Attorney General had granted Cervantes permission to "reenter" the United States; § 1326 requires absence of "consent . . . to reapply[ ] for admission" to the United States. Although Cervantes does not challenge the CNR on this basis, we note that, in the context of the administrative process, the difference is not material because "the Attorney General's consent to apply for admission is tantamount to his consent to the admission itself." *United States v. Sanchez-Milam*, 305 F.3d 310, 312 (5th Cir. 2002).

into the United States after deportation of exclusion relating to . . . Roberto Cervantes-Flores.[3]

[9] Cervantes contends that admission of this certificate, absent live testimony by Jones, or proof that she was unavailable to testify and that he had a prior opportunity to cross-examine her, violated his rights under the Sixth Amendment's Confrontation Clause as recently articulated by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004). This is a question of first impression in this circuit. We review the alleged violation of the Confrontation Clause de novo, *see Lilly v. Virginia*, 527 U.S. 116, 137 (1999), and hold that the CNR was properly admitted as nontestimonial evidence under *Crawford*.

[10] The Sixth Amendment requires that a defendant in a criminal prosecution "enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford*, the Supreme Court rejected "the view that the Confrontation Clause applies of its own force only to in-court testimony, and that its application to out-of-court statements introduced at trial depends upon the law of Evidence." *Crawford*, 541 U.S. at 51 (citation and internal quotation marks omitted). Turning to history as a guide, the Court concluded that "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54. Admissibility under the Sixth Amendment thus turns not on the Federal Rules of Evidence or questions of reliability, but on whether the evidence in question is testimonial in nature:

Where nontestimonial hearsay is at issue, it is wholly

---

[3]On March 1, 2003, the INS officially ceased to exist, and its functions were transferred to the Department of Homeland Security ("DHS"). We continue to refer to the INS, however, because the CNR refers to the INS and its records.

consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . . Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.

*Id.* at 68.

**[11]** Despite heavy reliance on this testimonial/ nontestimonial distinction, the Court declined in *Crawford* to explicate fully the meaning of either term: "We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Id.* The opinion does, however, provide some guidance for ascertaining whether evidence is testimonial. The Court first stated that the Sixth Amendment incorporates the common law exceptions to the hearsay rule, as "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial." *Id.* at 56; *see also id.* at 54 ("[The Confrontation Clause] is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding."). The CNR does not, however, fall clearly within either the common law hearsay rule or any of its common law exceptions. Certificates of nonexistence of a record were inadmissible under the common law, but not because they were hearsay but rather because of the rule of "completeness," which required entry of the whole of a document or class of documents rather than excerpts or selections. *See* 5 Wigmore § 1678 ("Upon the common law principle [of completeness], a custodian of documents . . . lacked authority to certify that a specific document did not exist in his office or that a particular entry was not to be found in a register." (emphasis omitted)).[4]

---

[4]The Advisory Committee Notes to the 1972 proposed amendments to Federal Rule of Evidence 803, which does except the CNR from the hearsay rule as a public or official record, also suggest that evidence that a

*Crawford* also offered examples of testimonial statements — "prior testimony at a preliminary hearing, before a grand jury, or at a former trial," and "police interrogations"; and of nontestimonial statements — "business records or statements in furtherance of a conspiracy." *Id.* at 56; *see also id.* at 76 (Rehnquist, C.J. concurring) (interpreting the majority's exceptions as including official records as well as business records). The Fifth Circuit relied on these examples to hold that a CNR is nontestimonial in nature because it closely resembles a business record. *See United States v. Rueda-Rivera*, 396 F.3d 678, 680 (5th Cir. 2005) (stating that the documents in a defendant's immigration file are analogous to nontestimonial business records and that "[t]he CNR . . . , reflecting the absence of a record . . . , [does] not fall into the specific categories of testimonial statements referred to in *Crawford*"). We agree.

**[12]** By issuing the CNR, Jones certified that a record that the INS would keep in the course of its regularly conducted activities did not exist in the agency's files. She certified this fact in the same manner that she would certify that such a record *did* exist in those files and that it was an official record of the INS. *See, e.g.*, 8 C.F.R. § 103.7(d) (authorizing certain officials to certify "copies of files, documents, and records in the custody of [the Central Office of the Department of Homeland Security] and authorizing Ruth Jones to certify "the non-existence of an official Service record[ ]"). In either case, someone would have had to search the INS database to verify the document's existence or nonexistence.

It is true that Jones' certificate was prepared for litigation, one of the circumstances that *Crawford* emphasized as a con-

record does not exist arguably is not hearsay at all. *See* Fed. R. Evid. 803(7) advisory committee's note ("While probably not hearsay . . . , decisions may be found which class [evidence of nonexistence] not only as hearsay but also as not within any exception. In order to set the question at rest in favor of admissibility, it is specifically treated here.").

cern of the Sixth Amendment. However, the document her certification addresses is part of a class of documents that were not prepared for litigation. Adopting the concerns of the common law, the Court in *Crawford* based its distinction between testimonial and nontestimonial evidence in part on skepticism of government officers preparing evidence against a defendant:

> Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse — a fact borne out time and again throughout a history with which the Framers were keenly familiar. This consideration does not evaporate when testimony happens to fall within some broad, modern hearsay exception, even if that exception might be justifiable in other circumstances.

*Crawford*, 541 U.S. at 56 n.7. Cervantes contends that the CNR is just such a document — prepared by an INS official at the request of a federal prosecutor for use in the prosecution against the defendant — but Cervantes mischaracterizes the CNR.

**[13]** The CNR certifies the nonexistence of a record within a class of records that themselves existed prior to the litigation, much like business records. *Cf. United States v. Bahena-Cardenas*, 411 F.3d 1067, 1074-75 (9th Cir. 2005) (holding that a warrant of deportation, which included a statement that the officer who signed the warrant "witnessed" the defendant's departure, was nontestimonial under *Crawford* because it is a "routine, objective, cataloguing of an unambiguous factual matter"). Thus, had the Attorney General in fact denied Cervantes' application for consent, a government official would have prepared — for trial — a certification that the denial (which could be submitted in evidence as an extant document) was indeed an official record. Conversely, the CNR states that no such preexisting public record, which

would have been created and kept in the ordinary course of the INS's regular course of operations, can be found in those official records.

In Cervantes' case, the district court — before admitting the CNR under the public records exception set forth in Federal Rule of Evidence 803(10) — found that the CNR certified the absence of a record "regularly made and preserved by" the INS. *See* Fed. R. Evid. 803(10) ("The following are not excluded by the hearsay rule, even though the declarant is available as a witness: To prove the absence of a record . . . or nonexistence of a matter of which a record . . . was regularly made and preserved by a public office or agency, evidence in the form of a certification in accordance with rule 902, or testimony, that diligent search failed to disclose the record."); *see also* Fed. R. Evid. 803(6) advisory committee's note (stating that the "element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation" and that the phrase "course of a regularly conducted activity" is intended to capture the "essential basis" of the business records exception). Although Jones made the certification at the request of the prosecutor, the class of records as to whose contents she prepared her certification were created and kept in the ordinary course of the INS's activities, prior to and regardless of Cervantes' prosecution.

Finally, we note the obvious — that the CNR does not resemble the examples of testimonial evidence given by the Court. "Police interrogations" and "prior testimony at a preliminary hearing, before a grand jury, or at a former trial" all involve live out-of-court statements against a defendant elicited by a government officer with a clear eye to prosecution. *Crawford*, 541 U.S. at 56. Ruth Jones' certification that a par-

ticular record does not exist in the INS's files bears no resemblance to these types of testimonial evidence.

**[14]** We hold that the CNR is nontestimonial evidence under *Crawford* and thus was properly admitted by the district court.

## D. Jury Instructions

Cervantes argues that his conviction should be reversed because the jury instructions misrepresented one of the elements of 8 U.S.C. § 1326. Section 1326 provides that an alien who has previously been deported commits a criminal act by entering or being found in the United States — unless "the Attorney General has expressly consented to such alien's *reapplying* for admission" to the country. 8 U.S.C. § 1326(a)(2)(A) (emphasis added). The Ninth Circuit Model Jury Instruction used at Cervantes' trial required the government to prove that Cervantes "was found in the United States without the consent of the Attorney General of the United States."[5] This jury instruction, according to Cervantes, erroneously allowed the jury to convict Cervantes if it found he had received permission to *reapply* for entry but had not yet received permission to *enter*.

Cervantes' argument relies on a misapprehension of the administrative process. As the Fifth Circuit has explained, as

---

[5]The jury instruction read in full:

[T]he government must prove each of the following elements beyond a reasonable doubt:

First, the defendant is an alien;

Second, the defendant was deported from the United States;

Third, the defendant was found in the United States without the consent of the Attorney General of the United States; and

Fourth, at the time the defendant was found in the United States he was free from official restraint.

a functional matter, "the Attorney General's consent to apply for admission is tantamount to his consent to the admission itself." *Sanchez-Milam*, 305 F.3d at 312. A previously deported alien who wishes to reenter the United States undergoes a two step application process. The alien first requests the Attorney General's consent to reapply for admission to the United States. 8 C.F.R. § 212.2. If the Attorney General grants consent, the alien then applies not to the Attorney General but to the State Department for a visa authorizing entry. *See* 22 C.F.R. § 42.61. The *only* consent granted by the Attorney General in this process is consent to reapply to the State Department for admission to the United States. Once this consent to reapply has been granted, the alien has received the Attorney General's consent but lacks that of the State Department.

[15] The instruction requiring the jury to find that Cervantes "was found in the United States without the consent of the Attorney General of the United States" thus can only refer to the consent of the Attorney General to reapply to the State Department for admission. While ambiguous and perhaps in need of clarification, the instruction does not misstate the element of the crime.[6] Further, any ambiguity was harmless in this case. *See United States v. Jimenez-Borja*, 378 F.3d 853, 858 (9th Cir. 2004) (applying the harmless error rule to review of jury instructions). Cervantes has never argued or presented evidence to demonstrate that he applied for or received any form of consent from the Attorney General.

### E. Sentencing

[16] Finally, Cervantes argues that his Sixth Amendment

---

[6]Although we find the ambiguity harmless here, we acknowledge that had the defendant presented evidence of the Attorney General's consent to reapply, the instruction might have misled the jury into finding that consent inadequate. As that case is not before us, we do not address the proper formulation of the jury instructions in that situation.

rights were violated when the district court found facts related to his prior conviction and enhanced his sentence under the United States Sentencing Guidelines. *See* U.S.S.G. § 2L1.2(b). This argument, based on *Blakely v. Washington*, 592 U.S. 296 (2004), is foreclosed by *United States v. Quintana-Quintana*, 383 F.3d 1052, 1053 (9th Cir. 2004). Because the Sentencing Guidelines are no longer binding, however, and we cannot ascertain whether the district court would have imposed a different sentence under a discretionary regime, we remand to the district court for discretionary reconsideration of the sentence in light of *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc).

**Conviction AFFIRMED; REMANDED for sentencing proceedings**.