**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | Nos.   21-50259 |
| | 21-50261 |
| *Plaintiff-Appellee,* | |
| | D.C. Nos. |
| v. | 3:20-cr-00435-LAB |
| | 3:20-cr-00435-LAB-1 |
| JUAN CARLOS CABRERA, | 3:15-cr-00353-LAB-1 |
| *Defendant-Appellant.* | |
| | OPINION |

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted June 7, 2023
Pasadena, California

Filed September 29, 2023

Before:  MILAN D. SMITH, JR., DAVID F.
HAMILTON,[*] and DANIEL P. COLLINS, Circuit Judges.

---

[*] The Honorable David F. Hamilton, United States Circuit Judge for the
U.S. Court of Appeals for the Seventh Circuit, sitting by designation.

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Hamilton;
Concurrence by Judge Collins

## SUMMARY[**]

### Criminal Law

The panel affirmed Juan Carlos Cabrera's 2021 convictions and sentence for attempted illegal entry and attempted illegal reentry under 8 U.S.C. §§ 1325 and 1326, and the district court's judgment revoking supervised release arising from a prior conviction.

The panel held that the district court did not err in denying Cabrera's motion to suppress a statement he made to a Border Patrol agent about coming to the United States to find work. Cabrera argued that the statement, which he made while between border fences, should have been suppressed because he was "in custody" and was not given a *Miranda* warning prior to his admission. Under *United States v. Galindo-Gallegos*, 244 F.3d 728, 730 (9th Cir.), *as amended*, 255 F.3d 1154 (9th Cir. 2001), the panel needed to determine whether Cabrera's questioning was permissible pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), rather than whether he was "in custody" pursuant to *Miranda*. The panel held that the stop here met the requirements of *Terry*, and the agent's question

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

about Cabrera's purpose for being in the United States did not exceed the scope of allowable inquiry during such a stop.

The panel held that the district court did not abuse its discretion by excluding pursuant to Fed. R. Evid. 401 and 403 the testimony of Cabrera's only proposed witness, Tijuana immigration attorney Erica Pinheiro, whom Cabrera intended to call as a lay witness to testify about the "factual situation in Tijuana in November 2019"—specifically, the "enormous backlog of Central American migrants seeking asylum" due to the "metering" and "Remain in Mexico" policies in place at the time. Cabrera argued that the jury could have inferred from the testimony that he did not want to wait in line with thousands of other people seeking asylum at the port of entry. The panel wrote that neither the record nor Pinheiro's testimony could establish that Cabrera knew of the long lines, and the district court's concern about distracting the jury was reasonable.

The panel held that the district court did not abuse its discretion in formulating the jury instructions on the requisite intent for a § 1326 conviction. Cabrera argued that "additional verbiage" about "dual intent" confused and misled the jury, and required a jury to convict despite legal innocence. The panel wrote that Cabrera's attempt to distinguish between a "fully formed intent" and "part of his intent" is an attempt to circumvent the rule in *United States v. Argueta-Rosales*, 819 F.3d 1149 (9th Cir. 2016), under which the government must show that a defendant intended to "go at large" at the time he physically crossed the border. The panel wrote that the instructions clearly explained that intent was to be measured at the point that Cabrera first entered into the United States, and were not misleading or confusing.

The panel held that the district court, at sentencing, did not err in calculating Cabrera's criminal history score. Two of

Cabrera's prior convictions were § 1326 convictions from 2015 and 2017. The parties disputed whether the 2015 conviction should have been assigned three criminal history points, as the district court assigned, or two. Section 4A1.1(a) of the Sentencing Guidelines instructs that three points be added for each prior sentence of imprisonment exceeding one year and one month. The panel observed that to assign points to the 2015 conviction, the district court must have added to the original 12-month custodial sentence whatever length of time Cabrera received as a term of imprisonment imposed at the 2018 revocation of supervised release in the 2015 case. U.S.S.G. § 4A1.2(k)(1). The panel wrote that based on information in the 2015 record, the district court reasonably concluded that none of the parties were under the impression that the time Cabrera served toward his 2017 sentence could not also be included in his time-served sentence for violating his supervised release. The panel therefore held that, in determining whether the 2015 sentence was a term of imprisonment exceeding one year and month, the district court did not err by including 134 time-served days that overlapped with the time Cabrera served on his 2017 sentence, and in assigning three criminal history points to the 2015 sentence. Because the district court lacked authority to apply—and in fact did not apply—18 U.S.C. § 3585, the panel rejected Cabrera's argument that the district court misinterpreted it.

The panel also held that because the 2021 convictions are valid, the district court did not abuse its discretion by revoking Cabrera's supervised release based on those convictions.

Seventh Circuit Judge Hamilton concurred. He wrote separately with an observation about the Sentencing Guidelines dispute over how to count the length of Cabrera's two "time-served" sentences. He wrote that the answer under the Guidelines has virtually nothing relevant to say to a sentencing

judge about an appropriate sentence for Cabrera under the statutory purposes of sentencing: reflecting the seriousness of the offense, promoting respect for the law, providing just punishment for the offense, affording adequate deterrence of criminal conduct, protecting the public from further crimes by Cabrera, and providing him with needed correctional treatment.

Judge Collins concurred. He noted his general agreement with Judge Bybee's separate opinion in *Argueta-Rosales* explaining why this court's jurisprudence concerning the intent element of a § 1326 prosecution warrants re-examination by the en banc court. Judge Collins also noted his disagreement with the sentiments expressed in Judge Hamilton's concurrence. He wrote that this court's caselaw ensures that the Guidelines retain their critical role, even after *United States v. Booker*, 543 U.S. 220 (2005), in selecting the appropriate sentence.

**COUNSEL**

Kara Hartzler (argued), Federal Public Defender, Federal Defenders of San Diego Inc., San Diego, California, for Defendant-Appellant.

Zachary J. Howe (argued) and Colin M. McDonald, Assistant United States Attorneys; Daniel E. Zipp, Assistant United States Attorney, Appellate Section Chief, Criminal Division; Randy S. Grossman, United States Attorney; United States Department of Justice, United States Attorney's Office, San Diego, California; Amanda T. Muskat, Fitzgerald Knaier LLP, San Diego, California; for Plaintiff-Appellee.

## OPINION

M. SMITH, Circuit Judge:

Defendant-Appellant Juan Cabrera was found guilty of attempted illegal entry pursuant to 8 U.S.C. § 1325 and attempted illegal reentry pursuant to 8 U.S.C. § 1326. On appeal, he argues that the district court violated his rights to a fair trial and sentence. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTS AND PRIOR PROCEEDINGS

Juan Cabrera is a native and citizen of El Salvador. In the early 1990s, Cabrera left El Salvador to live in the United States.[1] Cabrera never held legal status in the United States. After committing a string of various offenses, he was deported in 2001.

Over the years, Cabrera tried to return to the United States several times but was unsuccessful. He has previously been convicted of illegally entering the United States in 2015 and 2017. In 2018, Cabrera was caught reentering the country and applied for asylum based on his fear of gang violence in El Salvador. Cabrera's application was denied, and he was again deported to El Salvador.

In 2019, Cabrera went to Tijuana and climbed one of two fences separating Mexico from the United States. Cabrera did not attempt to climb the second fence. Instead, he simply sat down. After about seven minutes, Border Patrol Agent Joseph Cisneros drove up to Cabrera. In Spanish, Agent Cisneros asked Cabrera what he later testified were three

---

[1] The record does not indicate exactly how or when Cabrera first entered the United States, but it does show that he lived in Boston from 1994 to 2001.

"standard" questions typically asked by border patrol, namely: (1) what his citizenship was, (2) if he had any immigration documents authorizing entry into the United States, and (3) how and when he entered the United States. Agent Cisneros then asked Cabrera "what [] his purpose [was] for crossing into the United States." According to Agent Cisneros, Cabrera answered that he entered the country "just for work" and said nothing else.

The government charged Cabrera with attempted illegal entry pursuant to 8 U.S.C. § 1325 and attempted illegal reentry pursuant to 8 U.S.C. § 1326. To prove guilt pursuant to these statutes, the government must have shown that Cabrera had the "specific intent to []enter free from official restraint," which means intent to "go at large within the United States" and "mix with the population." *United States v. Castillo-Mendez*, 868 F.3d 830, 836 (9th Cir. 2017); *see also United States v. Rizo-Rizo*, 16 F.4th 1292, 1295 n.1 (9th Cir. 2021), *cert. denied*, 143 S. Ct. 120 (2022). In addition, the government must have shown that Cabrera intended to "go at large" at the time he physically crossed the border. *See United States v. Argueta-Rosales*, 819 F.3d 1149, 1161 (9th Cir. 2016).

Cabrera's intent was the only issue in dispute when the case went to trial. At trial, the government asserted that Cabrera climbed the fence to enter the United States undetected and find work. Claiming that it is "[im]possible to convict a previously deported alien for attempted illegal reentry . . . when he crosses the border with the intent only to be [arrested]," *id.* at 1151, Cabrera's counsel argued he climbed the fence solely to get arrested so he could reapply for asylum—and only thereafter find work. *See* 8 C.F.R. § 208.7(a)(1) ("[A]n applicant for asylum who is not an aggravated felon shall be eligible . . . to request employment

authorization."). Ultimately, a jury found Cabrera guilty of both counts. The district court sentenced Cabrera to 51 months in custody. It also revoked Cabrera's term of supervised release. Cabrera timely appealed.

## ANALYSIS

On appeal, Cabrera challenges the district court's (1) admission of his un-Mirandized statement at the border; (2) exclusion of testimony by Erica Pinheiro pertaining to conditions at the border; (3) "dual-intent" jury instructions; and (4) calculation of his sentence.

## I.    Motion to Suppress

Prior to trial, the district court denied Cabrera's motion to suppress the statement he made to Agent Cisneros about coming to the United States to find work based on *Miranda v. Arizona,* 384 U.S. 436 (1966). On appeal, Cabrera argues the statement should have been suppressed because he was "in custody" and was not given a *Miranda* warning prior to his admission.

We review the district court's admission of an un-Mirandized statement de novo. *See United States v. Zapien*, 861 F.3d 971, 974 (9th Cir. 2017) (per curiam). Ordinarily, we assess whether someone is "in custody" for *Miranda* purposes by determining "whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *United States v. Medina-Villa*, 567 F.3d 507, 520 (9th Cir. 2009), *as amended* (June 23, 2009) (quoting *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981)). However, "[t]he case books are full of scenarios in which a person is detained by law enforcement officers, is not free to go, but is not 'in

custody' for *Miranda* purposes." *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001) (citing cases).

For instance, in *Berkemer v. McCarty*, the Supreme Court held that a person subject to a traffic stop is not "in custody" for purposes of *Miranda*. 468 U.S. 420, 440 (1984). Analogizing the relatively unintrusive nature of traffic stops to stops made pursuant to *Terry v. Ohio,* 392 U.S. 1 (1968),[2] the *Berkemer* Court stated that "[t]he similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Id*. at 439–440; *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85 (1975) (citing *Terry* and noting that Border Patrol may stop vehicles at the border when the facts "reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country"). Indeed, one of our sister circuits has explained that courts' "task post-*Berkemer* is to determine whether the facts of a specific case indicate a situation more akin to a routine traffic stop, at which *Miranda* warnings are not required, or indicate that a suspect has been 'subjected to restraints comparable to those associated with a formal arrest, at which point *Miranda* warnings are required.'" *United States v. Campbell*, 741 F.3d 251, 266 (1st Cir. 2013) (quoting *Berkemer*, 468 U.S. at 441).

We applied *Berkemer's* reasoning to stops at the border in *United States v. Galindo-Gallegos*, 244 F.3d 728, 730 (9th Cir.), *as amended*, 255 F.3d 1154 (9th Cir. 2001). In *Galindo-Gallegos*, two border patrol officers apprehended a

---

[2] A *Terry* stop is an officer's brief detention of a person when the officer reasonably suspects that the person has committed or is about to commit a crime. *See Terry*, 392 U.S. at 26.

group of fifteen to twenty individuals running from the border in an isolated location, told them to sit on the ground, and asked them questions regarding their citizenship and immigration status. *Id*. at 729. The panel held that "[w]here officers apprehend a substantial number of suspects and question them in the open prior to arrest, this is ordinarily a *Terry* stop, not custodial questioning, under *Berkemer*." *Id*. at 732.

Since *Galindo-Gallegos*, our court has consistently addressed *Miranda* challenges at the border by asking whether the detention constituted a permissible *Terry* stop, or something more. For example, in *Medina-Villa*, the panel held that "when border patrol agents stop a car based on reasonable suspicion that individuals are illegally present in the country and question the occupants regarding their citizenship and immigration status, the occupants are not in custody for *Miranda* purposes." 567 F.3d at 520. Similarly, in *United States v. Cervantes-Flores*, the court construed the stopping of a car "40 miles north of the United States border" as a *Terry* stop, and found the stop to be permissible because the border patrol officer had reasonable suspicion to stop the car, and the stop was not overly intrusive. 421 F.3d 825, 829–30 (9th Cir. 2005), *overruled on other grounds by Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). *Cervantes-Flores* also explained that certain standard questions, such as a migrant's "place of birth," "his citizenship," and "whether he had permission to be in the United States and how he had crossed into the United States," were permissible aspects of a *Terry* stop because they were "reasonably limited in scope to determining whether [the migrant] had crossed the border illegally." *Id.* at 830.

Thus, in considering Cabrera's case, we must determine whether his being questioned in between the border fences was permissible pursuant to *Terry*, rather than whether he was "in custody" pursuant to *Miranda*. *Galindo-Gallegos*, 244 F.3d at 732.

The stop here meets the requirements of *Terry*. First, Cabrera's location between border fences would give any agent reasonable suspicion to believe he may have been entering the country illegally. Second, "[t]he detention [here] was brief and the limited restraint was reasonable under the circumstances." 244 F.3d 728 at 735 (Paez, J., concurring). The stop here lasted approximately ten minutes. Moreover, any "restraint" to which Cabrera was subjected was limited and reasonable. Agent Cisneros stood approximately three feet away from Cabrera the entire time he questioned him. He did not handcuff Cabrera, threaten or yell at him, or brandish his weapon. We have affirmed convictions based on *Terry* stops involving significantly more force than was involved in this case. *See, e.g.*, *Medina-Villa*, 567 F.3d at 509 (holding that agents did not "venture beyond the restraints of . . . *Terry* or *Berkemer*" where defendant was "seen by a border patrol agent running from the fence between the United States and Mexico along with two other individuals," "[got] into the passenger seat of a parked car," and then were physically blocked from leaving the parking lot and ordered out of the vehicle by an agent with a drawn gun); *Cervantes-Flores,* 421 F.3d at 828 (approving *Terry* stop where an agent "subdued and handcuffed [defendant]" near the border); *cf. Galindo-Gallegos,* 244 F.3d at 735 (Paez, J., concurring) (approving *Terry* stop where defendant "tried to run away from the officers, was chased and caught, and was brought back, made to sit in a circle, and questioned.")

Finally, Agent Cisneros's question about Cabrera's purpose for being in the United States did not "exceed the scope of allowable inquiry during such a stop," because it was "reasonably related in scope to the justification" for it, *i.e.*, Agent Cisneros's suspicion that Cabrera might have been entering illegally. *Gallegos*, 244 F.3d at 735 (quoting *Brignoni-Ponce,* 422 U.S. at 881). We therefore conclude that the district court did not err in denying Cabrera's motion to suppress.

## II.    Witness Testimony

Cabrera next contends that the district court abused its discretion by excluding the testimony of his only proposed witness.[3] Prior to trial, Cabrera indicated that he intended to call Tijuana resident Erica Pinheiro as a witness. Although Pinheiro was an immigration attorney, Cabrera intended to call her as a lay witness to testify about "the factual situation in Tijuana in November of 2019." Specifically, Cabrera proffered that Pinheiro would testify about the "enormous backlog of Central American migrants seeking asylum" due to the "metering" and "Remain in Mexico" policies in place at the time.[4]

Initially, Cabrera offered Pinheiro's testimony to show that, due to the backlog, "the word was that you could climb over the fence and try to get your asylum application that way." After the district court expressed concern that such testimony would amount to "collective hearsay," Cabrera

---

[3] Cabrera chose not to testify at trial.

[4] Cabrera states that under the "metering" policy, border officials began limiting the number of people who could apply daily at the port of entry. He states that, under the Remain in Mexico policy, asylum seekers "could not remain in the U.S. while their case was pending."

offered to narrow the testimony to "the long wait [at the border], the reasons for the wait and the fact that there w[ere] thousands of people waiting." Cabrera argues the testimony would have supported his theory that he crossed the border with the intent to be apprehended because the jury could have inferred from the testimony that Cabrera did not want to wait in line with thousands of other people seeking asylum at the port of entry.

The district court determined that the evidence was of little to no relevance pursuant to Federal Rule 401. It also determined under Rule 403 that, to the extent the testimony was relevant, its probative value was substantially outweighed by the danger of diverting the jury's attention away from Cabrera's state of mind and into a mini trial about conditions at the border.

We review "[a] district court's admission of evidence, including its Rule 403 balancing" for abuse of discretion. *United States v. Jayavarman*, 871 F.3d 1050, 1063 (9th Cir. 2017). Rule 403 determinations are "subject to great deference," because "the considerations arising under Rule 403 are susceptible only to case-by-case determinations, requiring examination of the surrounding facts, circumstances, and issues." *United States v. Hinkson*, 585 F.3d 1247, 1267 (9th Cir. 2009) (en banc) (internal quotation marks and citation omitted).

The district court did not abuse its discretion by excluding Pinheiro's testimony. First, even if Pinheiro could testify about long lines at the port of entry, neither the record nor her testimony could establish that Cabrera *knew* of these long lines. Absent that evidentiary link, any facts about the number of people waiting in line at the port of entry would carry little weight. *See, e.g.*, *United States v. Trudeau*, 812

F.3d 578, 591 (7th Cir. 2016) ("When a defendant offers nothing but speculation to link a piece of evidence to his state of mind, the evidence is properly excluded.").

Second, the district court's concern about distracting the jury was reasonable.  Absent the link connecting Cabrera's knowledge to conditions at the border, the jury would be invited to speculate about what Cabrera did or did not know at the time he crossed the border.  In addition, the fact that a Border Patrol agent who did testify at trial stated that he was unaware of the existence of a long wait at the border justifies the district court's concern that the trial could have devolved into one about border conditions rather than one about Cabrera's state of mind.

## III.    Jury Instructions

Cabrera next challenges the district court's jury instructions.  We review the formulation of jury instructions for an abuse of discretion.  *United States v. Rodriguez*, 971 F.3d 1005, 1017 (9th Cir. 2020).  "[T]he question on appeal is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Tuan Ngoc Luong*, 965 F.3d 973, 986 (9th Cir. 2020) (cleaned up).

Cabrera contends that the district court erred by including in the standard instruction for § 1326 language about "dual intent," *i.e.*, language indicating that the government need not prove a defendant's intent to evade authorities was his *sole* intent in entering the United States. Specifically, Cabrera challenges the bolded portions of the instruction below, which were read to the jury:

> [The government] must prove that at the
> point that he first entered into the United

States, [Cabrera] specifically intended to enter free from official restraint **or at least that that was part of his intention and motivation** and that he specifically planned that, not that it was his only purpose, **but at least it was part of his purpose**.[5]

Notably, Cabrera does not dispute that the above statements of law are *correct*. He acknowledges that, in *Argueta-Rosales*, we expressly stated that "the government need not prove that entry free from official restraint was the defendant's *sole* intent" and that "[t]he government must prove only that [the defendant] had *a* specific intent to enter the United States free from official restraint, not that this was his only purpose." 819 F.3d at 1157 (emphasis in original).

Instead, Cabrera argues that the district court's "additional verbiage" to the standard instruction "confused and misled the jury." In his view, the "mens rea element require[s] [] Cabrera to have a 'fully formed intent' to go at large—not a desire that was 'part of his intention.'" But as the district court noted, Cabrera's attempt to distinguish between a "fully formed intent" and "part of his intent[]" is simply an attempt to circumvent the *Argueta-Rosales* rule.

Cabrera insists that the additional verbiage in the instruction would "require [a] jury to convict [a person] despite his legal innocence," because it would require a

---

[5] Cabrera seems to also be challenging other portions of the jury instructions by inserting them into a chart in his brief, which chart compares the trial court instructions "as written" vs. "as read." However, he never explained what is wrong with the bolded portions of these other "as read" instructions and therefore waives any arguments about them. *See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138–39 (9th Cir. 2019) (noting that arguments lacking "meaningful briefing" are waived).

finding of guilt for "a person who intends to work *after* first going into custody to apply for asylum." But because intent is measured "from the moment of crossing," *United States v. Lombera-Valdovinos*, 429 F.3d 927, 930 (9th Cir. 2005), such a person cannot be found guilty, because his intention upon crossing the border was to be apprehended. Logically, it is impossible to cross the border simultaneously intending (1) to "cross[] the border with the intent only to be imprisoned" and (2) to "enter the country free from official restraint." *Argueta-Rosales*, 819 F.3d at 1155–56 (citations omitted); *id*. ("[I]f [a defendant] actually intended to sneak into the country, and changed his plans only when he was spotted by the border patrol, he again would be guilty." (internal quotation marks omitted))

The instructions clearly explained that intent was to be measured "at the point that [Cabrera] first entered into the United States." Jury instructions must be judged "as a whole," *United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010), and, when read with the timing requirement, the instructions here were not misleading or confusing. The district court did not abuse its discretion in formulating the intent instruction.

## IV.   Sentencing

Finally, Cabrera argues that the district court incorrectly calculated the Guidelines range during sentencing. Specifically, he argues that the district court incorrectly calculated his criminal history score. We "review the district court's interpretation of the Guidelines de novo, the district court's application of the Guidelines to the facts of the case for abuse of discretion, and the district court's factual findings for clear error." *United States v. Perez*, 962 F.3d 420, 447 (9th Cir. 2020) (citation omitted).

Under the Sentencing Guidelines, criminal history points are assigned based on the length of a prior "sentence of imprisonment." U.S. Sent'g Guidelines Manual § 4A1.1 (U.S. Sent'g Comm'n 2015) (Guidelines or U.S.S.G). The term "sentence of imprisonment" means "a sentence of incarceration and refers to the maximum sentence imposed." U.S.S.G. § 4A1.2(b)(1). As a result, "criminal history points are based on the sentence pronounced, not the length of time actually served." *United States v. Mendoza-Morales*, 347 F.3d 772, 775 (9th Cir. 2003) (quoting U.S.S.G. § 4A1.2, cmt. n. 2). However, a defendant "must have actually served" some time in custody for his sentence to qualify as a "sentence of imprisonment." *Id.*

Time served sentences present a unique situation when calculating the length of a "sentence of imprisonment." That is because the "sentence pronounced" is simply "time served," i.e., such sentences typically do not refer to a number of days. Instead, "when courts sentence defendants in pre-conviction detention to 'time served,' it is generally understood that the pre-conviction custody thereby becomes the term of imprisonment imposed by the judgment." *Arreguin-Moreno v. Mukasey*, 511 F.3d 1229, 1232 (9th Cir. 2008) (quoting *Spina v. Dep't of Homeland Sec.*, 470 F.3d 116, 128 (2d Cir. 2006)).[6]

Thus, in *United States v. Rodriguez-Lopez*, we rejected the defendant's contention that "the district court incorrectly included a prior section 1326 conviction in the calculation of his criminal history category because he was sentenced to

---

[6] *See also Sentenced to Time Served*, Black's Law Dictionary (11th ed. 2019) ("A sentencing disposition whereby a criminal defendant is sentenced to the same jail time that the defendant is credited with serving while in custody awaiting trial.").

'time served' as opposed to a specific period of time."  170 F.3d 1244, 1246 (9th Cir. 1999).  We explained that "[t]his contention lacks merit because at the time he was sentenced to 'time served,' he had served sixty-two days between his arrest and sentence," thus warranting the addition of points to his criminal history score.  *Id.*

### A. Cabrera's Prior Convictions

In this case, two of Cabrera's prior convictions are relevant to the district court's calculation of his criminal history score.  One is a prior § 1326 conviction from 2015 (the 2015 case).  The other is another § 1326 conviction from 2017 (the 2017 case).

In the 2015 case, Cabrera was sentenced to 12 months in custody and two years of supervised release.  About a year and seven months into his supervised release term, Cabrera reentered the United States, for which he was arrested and charged in a new § 1326 case—the 2017 case.

About a month after Cabrera's arrest in the 2017 case, the Probation Department filed a petition seeking to revoke supervised release in his original 2015 case.  In total, Cabrera had been in custody for approximately five and a half months before he was sentenced in either case.

The sentencing hearings for the two cases occurred only four days apart from one another.  First, on January 25, 2018, Cabrera was sentenced to time served for the 2017 case. Cabrera was still in custody when, on January 29, 2018, Judge Lorenz imposed a separate sentence of time served, plus two years of supervised release, for Cabrera's violation of his supervised release in the 2015 case.

## B. Current Conviction

To calculate the Guidelines range for the instant conviction, the district court had to assign points to each of the two convictions above.  In relevant part, the Guidelines instruct:

> (a) Add 3 points for each prior sentence of imprisonment exceeding one year and one month.
>
> (b) Add 2 points for each prior sentence of imprisonment of at least sixty days not counted in (a).

U.S.S.G. § 4A1.1.  At sentencing, neither party disputed that only two points should be assigned to the 2017 conviction, which involved a term of imprisonment of 168 days—a term "of at least sixty days" not exceeding thirteen months. U.S.S.G. § 4A1.1(b).

However, the parties did dispute whether the 2015 conviction should have been assigned two or three points. The one-point difference was significant because assigning three points to the 2015 conviction moved Cabrera's criminal history category up from IV (21-27 months) to V (27-33 months).

To assign points to the 2015 conviction, the district court must have added whatever length of time Cabrera received as a "term of imprisonment imposed upon revocation" to the original, 12-month custodial sentence.  U.S.S.G. § 4A1.2(k)(1).  The parties dispute the length of this "term of imprisonment."

The government argues that the time served sentence in the 2015 case included the 134 days that overlapped with the

time Cabrera served on his 2017 sentence. For support, it points to the sentencing record—judicially noticed by the district court below—in the 2015 case, showing that Judge Lorenz intended for Cabrera's "time served" sentence to encompass more than four days.

The record shows that, when asked at the violation hearing about how much time Cabrera had already served until that point, defense counsel stated: "So it will be five -- it will be six months in a week or two." Counsel also explained that the guidelines range for the 2015 violation would be "four to ten months," and Judge Lorenz did not express an interest in departing or varying from that range. To the contrary, that range informed his ultimate decision:

> All right. This is, based on the change to [the instant charge,] 1325, a Grade C violation, Category II, four to ten months. **He's apparently coming up on six months already**. He was given time served in the underlying case. I'm going to give him time served in this case also.

Based on information in the 2015 record, the district court below reasonably concluded that none of the parties were under the impression that the time Cabrera served toward the 2017 sentence could not also be included in his time-served sentence for violating his supervised release. The district court therefore did not err in adding the 134 days to Cabrera's 2015 sentence for purposes of calculating his criminal history score.

To resist this conclusion, Cabrera argues that the district court "misinterpreted" the language of 18 U.S.C. § 3585. That statute states: "A defendant shall be given credit toward

the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . *that has not been credited against another sentence.*" 18 U.S.C. § 3585 (emphasis added). Cabrera argues that the district court erred in including the 134 days in the 2015 sentence in the points calculation because that amount of time was already "credited against another sentence"—the 2017 sentence, which was imposed just a few days before.

As a threshold matter, however, Section 3585 is not a mechanism by which a *district court* credits time against a sentence it imposes; in fact, we have held that "district court[s] lack[] authority under 18 U.S.C. § 3585(b) to grant [a defendant] credit for the time he had served after his arrest." *United States v. Peters,* 470 F.3d 907, 909 (9th Cir. 2006). Instead, the Bureau of Prisons (BOP)—rather than the sentencing court—calculates the defendant's entitlement to sentencing credit under § 3585(b) in the first instance. *See United States v. Wilson*, 503 U.S. 329, 335 (1992). "A defendant may then challenge BOP's calculation—in other words, the execution of the sentence—by filing a petition for a writ of habeas corpus under 28 U.S.C. § 2241." *Zavala v. Ives*, 785 F.3d 367, 370 n.3 (9th Cir. 2015).

Because the district court lacked the authority to apply—and in fact did not apply—§ 3585, it could not have exceeded its authority in "misinterpreting" it. *See Peters*, 470 F.3d at 909 ("Because the district court lacked authority to grant credit under § 3585(b) in the first place, it did not exceed its authority.") The district court therefore did not abuse its discretion in rejecting this argument. Nor did it abuse its discretion by revoking Cabrera's supervised release "based on the conviction of Mr. Cabrera by the jury" because that conviction, for the reasons stated above, is valid. *See* 18

U.S.C. § 3583(e)(3) (stating that a district court may revoke a term of supervised release only if it "finds by a preponderance of the evidence that the defendant violated a condition of supervised release").

## CONCLUSION

For the above reasons, we **AFFIRM** the district court.

---

HAMILTON, Circuit Judge, concurring:

I join the court's opinion in full. I write separately with an observation about the Sentencing Guidelines dispute over how to count the lengths of Cabrera's two "time-served" sentences imposed in 2017. Judge Smith's opinion for the court correctly analyzes and applies the relevant statutes and guideline provisions. I submit, however, that the answer to this esoteric question under the Guidelines has virtually nothing relevant to say to a sentencing judge about an appropriate sentence for Mr. Cabrera under the statutory purposes of sentencing: reflecting the seriousness of the offense, promoting respect for the law, providing just punishment for the offense, affording adequate deterrence of criminal conduct, protecting the public from further crimes by Mr. Cabrera, and providing him with needed correctional treatment. See 18 U.S.C. § 3553(a)(2).

The judge who sentenced Mr. Cabrera to the two time-served sentences in 2017 almost certainly was not worrying about how they might be scored under the Guidelines if Mr. Cabrera were to be convicted in a future United States prosecution. In response to the parties' debate here over exactly what the sentencing judge in 2017 said about the time-served sentences, it would have been appropriate for the sentencing judge to ask, "Why should I care?" See

*United States v. Marks*, 864 F.3d 575, 576 (7th Cir. 2017) (encouraging district courts to ask this question when confronting "arcane and arbitrary" issues under the Guidelines).

Long before the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), made the Guidelines advisory, the Sentencing Commission itself recognized that wooden application of the Guidelines could sometimes produce arbitrary results. That is especially true in criminal history calculations, where the complex details can produce arbitrary cliffs and cutoffs. Even as first adopted in 1987, the Guidelines encouraged sentencing departures for over- or under-representative criminal history. See U.S.S.G. § 4A1.3 (1987). That encouragement remains in place in § 4A1.3 in effect today.

This circuit's precedents show district judges that it is not easy to establish that an arguable guideline mistake has not affected a sentence, so that any error would be harmless. E.g., *United States v. Dominguez-Caicedo*, 40 F.4th 938, 963–64 (9th Cir. 2022) (district court's discussion of alternative guideline ranges at end of sentencing hearing not sufficient to show it would have reached same result if it had started with alternative range and kept it in mind throughout process); *United States v. Munoz-Camarena*, 631 F.3d 1028, 1030–31 & n.5 (9th Cir. 2011) (district court can show arguable guideline error did not affect sentence by, for example, performing sentencing analysis twice, beginning with both correct and incorrect ranges); *United States v. Williams*, 5 F.4th 973, 978 (9th Cir. 2021) (declining to find guideline error harmless where district court did not explain sentence sufficiently under alternative guideline calculation). The treatment of the two time-served sentences here presents an issue where it would be worth a district

judge's extra effort to establish such a clear record that any arguable guideline error would have been harmless. If an executive agency based an important decision on such a narrow technicality so divorced from the relevant statutory purposes, I suspect we could easily find it arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2).[1]

---

[1] This circuit demands more of an effort by a district court than other circuits do to show that an arguable guideline error was harmless. See, e.g., *United States v. Ahmed*, 51 F.4th 12, 22 (1st Cir. 2022) (arguable error was harmless where district court made clear that choice of sentence did not depend on issue); *United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009) (arguable error was harmless where district court said unequivocally that it would impose same sentence either way); *United States v. Mills*, 917 F.3d 324, 330 (4th Cir. 2019) (arguable error was harmless where district court said it would impose same sentence regardless and sentence would be reasonable under either guideline calculation); *United States v. Reyna-Aragon*, 992 F.3d 381, 388–89 (5th Cir. 2021) (arguable error was harmless where court made "firm, plain, and clear" statement that issue did not affect sentence); *United States v. Smith*, 75 F.4th 659, 665–66 (6th Cir. 2023) (government showed arguable error was harmless beyond reasonable doubt where court said sentence was appropriate regardless of starting guideline range for calculating departure); *United States v. Ihediwa*, 66 F.4th 1079, 1082 (7th Cir. 2023) (boilerplate disclaimer is not enough to show arguable error was harmless, but court's credible and thorough explanation was sufficient); *United States v. Neri*, 73 F.4th 984, 988 (8th Cir. 2023) (arguable error was harmless where court indicated it would have imposed same sentence under different guideline range); *United States v. Gieswein*, 887 F.3d 1054, 1062–63 (10th Cir. 2018) (simple statement by court would not be enough, but arguable error was harmless where court thoroughly explained sentence independent of guideline calculations); *United States v. Goldman*, 953 F.3d 1213, 1221 (11th Cir. 2020) (arguable error was harmless where court indicated sentence would be same either way and sentence is substantively reasonable).

COLLINS, Circuit Judge, concurring:

I concur in Judge M. Smith's opinion, which faithfully applies our binding precedent, including *United States v. Argueta-Rosales*, 819 F.3d 1149 (9th Cir. 2016). At the same time, I wish to note my general agreement with Judge Bybee's separate opinion in that case, which cogently explained why, in an appropriate case, our jurisprudence concerning the intent element of a prosecution under 8 U.S.C. § 1326 warrants re-examination by the en banc court. *See id*. at 1162–71 (Bybee, J., concurring in part and dissenting in part).

I also wish to note my vigorous disagreement with the sentiments expressed in Judge Hamilton's concurrence. In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that, in order to avoid a Sixth Amendment problem under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the statutory mandate to impose a sentence within the Sentencing Guidelines range (absent grounds for departure within the Guidelines) must be "sever[ed] and excise[d]," with the result that the Guidelines were rendered advisory. *See Booker*, 543 U.S. at 259. But even after *Booker*, the applicable Guidelines range, the Guidelines' policy statements, and the "need to avoid unwarranted sentencing disparities" among similarly situated defendants (which is a central objective of the Guidelines system), all remain crucial factors that a court explicitly must consider in imposing any sentence. 18 U.S.C. § 3553(a)(4)–(6). Judge Hamilton may think that these considerations are "divorced from the relevant statutory purposes," *see* J. Hamilton

Concurrence at 24, but the statutory text says otherwise.  So does this circuit's settled caselaw.  As we recently explained:

> "A mistake in calculating the recommended Guidelines sentencing range is a significant procedural error that requires us to remand for resentencing."  *United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011).  "When a defendant is sentenced under an incorrect Guidelines range— whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016). . . .  At the same time, a sentencing error can be harmless.  *See Munoz-Camarena*, 631 F.3d at 1030 n.5.  To establish harmlessness, the Government must show that "it is more probable than not" that the error did not affect the sentence.  *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997) (en banc); *see also United States v. Olano*, 507 U.S. 725, 734 (1993).
>
> A "district court's mere statement that it would impose the same . . . sentence no matter what the correct calculation cannot, without more, insulate the sentence from remand."  *Munoz-Camarena*, 631 F.3d at 1031; *see also United States v. Williams*, 5 F.4th 973, 978 (9th Cir. 2021).  This is because a district court's analysis must "flow

from an initial determination of the correct Guidelines range," *id.* at 1031, and the district court must keep that range "in mind throughout the process," *id.* at 1030 (quoting *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008)).  At the same time, a sentencing error may be harmless if the district court "acknowledges that the correct Guidelines range is in dispute and performs [its] sentencing analysis twice, beginning with both the correct and incorrect range."  *Id.* at 1030 n.5.

*United States v. Dominguez-Caicedo*, 40 F.4th 938 (9th Cir. 2022).

Judge Hamilton thinks it wrong that this circuit "demands more of an effort by a district court than other circuits do to show that an arguable guideline error was harmless," *see* J. Hamilton Concurrence at 24 n.1, but I disagree.  Our caselaw ensures that the Guidelines retain their critical role, even after *Booker*, in selecting the appropriate sentence.  A system in which a district court dismisses the Guidelines calculations as "narrow technicalit[ies]" or "arcane and arbitrary" distinctions that judges should not "care" about, *see id.* at 22–23, resembles more the free-wheeling regime that preceded the Sentencing Reform Act of 1984 than the post-*Booker* regime that the Supreme Court has bequeathed us.